## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

———————————————————————
                                              :
EMILY ROBB, TARYN PIANO,                      :
KELLY GERRITY, TAYLOR PLOUSE,                 :
JACQUELYN BINGHAM,                            :
TAMIA ROACH, MACKENZIE FARLEY,                :
and KAYLA BRATHWAITE,                         :
on behalf of themselves                       :
and all similarly situated individuals,       :        Civil Action No. _____
                                              :
                        Plaintiffs,           :
                                              :
              v.                              :
                                              :
LOCK HAVEN UNIVERSITY                         :
OF PENNSYLVANIA,                              :
                                              :
                        Defendant.            :
———————————————————————:

## COMPLAINT – CLASS ACTION

Plaintiffs bring this complaint against defendant and in support state:

1.     Student-athletes Emily Robb, Taryn Piano, Kelly Gerrity, Taylor Plouse, Jacquelyn Bingham, Tamia Roach, Mackenzie Farley, and Kayla Brathwaite, bring this class action against Lock Haven State University ("LHU") to challenge its failure to provide equitable athletic participation opportunities and benefits for female students.  This complaint challenges both longstanding sex discrimination that continues to this day and new discriminatory plans that will result in the elimination of the women's swim team and the demotion of the women's field

hockey team in the very near future. Plaintiffs bring this action on behalf of themselves and a class of current, prospective, and future LHU female students. LHU's actions have caused harm and will imminently cause even greater, irreparable harm to plaintiffs and to the plaintiff class if they are not enjoined. LHU's actions constitute intentional discrimination on the basis of sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX). Title IX prohibits sex discrimination by educational institutions that receive federal financial assistance.

2.    LHU has long violated Title IX by failing to provide female students with an equal opportunity to participate in varsity intercollegiate athletics and by failing to provide its female athlete with the same benefits it provides to male athletes. LHU now seeks to exacerbate that existing sex discrimination by announcing its imminent engagement in new sex discrimination that will, among other things, substantially damage the women's swimming program and demote the women's field hockey team from NCAA Division I status to NCAA Division II status.

3.    Plaintiffs seek a temporary restraining order and preliminary injunction to retain the status quo so that LHU cannot implement its newly announced discriminatory actions. Plaintiffs also seek a permanent injunction that will permanently enjoin the newly planned discrimination and will remedy the existing

sex discrimination in the allocation of athletic participation opportunities and benefits.

## JURISDICTION AND VENUE

4.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(4).  Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§ 2201 and 2202.

5.    Venue is proper pursuant to 28 U.S.C. § 1391(b), as all of the claims arose in and the defendant is located in the State of Pennsylvania and within the Middle District of Pennsylvania.

## PARTIES

6.    Plaintiff Emily Robb is a full-time female student and varsity field hockey athlete at LHU.  During the school year, plaintiff resides in Lock Haven Pennsylvania, which is within the jurisdiction of this Court.

7.    Plaintiff Taryn Piano is a full-time female student and varsity field hockey team at defendant LHU.  During the school year, plaintiff resides in Lock Haven, Pennsylvania, which is within the jurisdiction of this Court.

8.    Plaintiff Kelly Gerrity is a full-time female student and member of the varsity swim team at defendant LHU.  During the school year, plaintiff resides in Lock Haven, Pennsylvania, which is within the jurisdiction of this Court.

9.     Plaintiff Taylor Plouse is a full-time female student and varsity field hockey team at defendant LHU.  During the school year, plaintiff resides in Lock Haven, Pennsylvania, which is within the jurisdiction of this Court.

10.     Plaintiff Jacquelyn Bingham is a full-time female student and member of the varsity swim team at defendant LHU.  During the school year, plaintiff resides in Lock Haven, Pennsylvania, which is within the jurisdiction of this Court.

11.     Plaintiff Tamia Roach is a full-time female student and member of the varsity field hockey team at defendant LHU.  During the school year, plaintiff resides in Lock Haven, Pennsylvania, which is within the jurisdiction of this Court.

12.     Plaintiff Mackenzie Farley is a full-time female student and varsity field hockey team at defendant LHU.  During the school year, plaintiff resides in Lock Haven, Pennsylvania, which is within the jurisdiction of this Court.

13.     Plaintiff Kayla Brathwaite is a full-time female student and member of both the varsity field hockey team and the track and field teams at defendant Lock Haven.  During the school year, plaintiff resides in Lock Haven, Pennsylvania, which is within the jurisdiction of this Court.

14.     Defendant LHU is a state university that is part of the Pennsylvania State System of Higher Education and is located in central Pennsylvania, with its principal place of business in Lock Haven, Pennsylvania, which is within the jurisdiction of this Court.

15.    LHU receives federal financial assistance and the benefits therefrom. Therefore, all LHU programs, including intercollegiate athletics, are subject to the requirements of Title IX. LHU must comply with Title IX and must not permit or engage in sex discrimination in any educational program or activity, including intercollegiate athletics.  Indeed, LHU has promised that it will comply with Title IX as a condition of its receipt of such federal financial assistance, as required by 34 C.F.R. §106.4.

## CLASS ACTION ALLEGATIONS

16.    The student plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) on behalf of themselves and on behalf of a class consisting of all present, prospective, and future LHU female students, who participate, seek to participate, or have been deterred or prevented from participating in or obtaining the benefits of intercollegiate athletics at LHU because of LHU's discriminatory actions.

17.    All class members are aggrieved persons under federal civil rights law as a result of LHU's actions, policies, and practices.  The named individual student plaintiffs seek declaratory and injunctive relief on behalf of themselves and all class members to prevent defendant from engaging in present and future unlawful conduct and to require defendant to rectify the effects of present and past discrimination.

18.    This matter is properly maintainable as a class action pursuant to Fed. R. Civ. P. 23(a)(1) in that joinder of all members of the proposed class is not only

impracticable, but also impossible, because the class includes members whose identities are incapable of being known at the present time.

19.    Due to the fluid nature of college enrollment and participation in intercollegiate athletics, the identities of proposed class members will change during the course of this litigation.  As some female students and athletes graduate or transfer schools, other class members will enroll as freshmen or transfer students. As some female athletes complete their NCAA eligibility, become injured, or otherwise leave their teams, new athletes will be recruited to replace them and new high school recruits will either be signed to play at LHU or be deterred from doing so because of LHU's discriminatory actions.  While existence of the class is enduring, the identity of individual members constantly changes daily, as is inherent with college athletics.

20.    The proposed class includes current female students for whom LHU has failed to provide an equal opportunity to participate in athletics and approximately 260 current female athletes for whom LHU has failed to provide athletic benefits comparable to those it provides its male athletes.  It also includes innumerable prospective and future female students who are or will be subjected to LHU's sex discrimination if it is not enjoined.

21.    The proposed class includes current, prospective, and future LHU female students who have the interest and ability to participate in sports that LHU

refuses to add despite failing to provide women with enough opportunities to equal those already provided to male students. The proposed class also includes current members of the LHU women's swim and field hockey teams, as well as prospective and future members of those teams, and women recruits deterred from enrolling at LHU or participating in those sports at LHU because of LHU's existing and new sex discrimination against those programs.

22. Although LHU's women's coaches are constantly recruiting hundreds of new prospective athletes each year, it is unknown how many prospective or future female students will enroll at LHU during this litigation or how many of them would enroll to participate in LHU athletics if LHU stopped discriminating on the basis of sex.

23. The proposed class also includes more than 20 female student athletes who participate in swimming, prospective and future members of the team (including current recruits, and female recruits who are deterred from enrolling at LHU or participating in women's swimming because of LHU's existing sex discrimination and/or its proposed new sex discrimination against the team. LHU has announced imminent plans to eliminate or substantially downgrade the women's swim program.

24. The proposed class includes approximately 25 female student athletes who participate in field hockey, prospective and future members of the team

(including current recruits, and female recruits who are deterred from enrolling at LHU or participating in women's field hockey because of LHU's existing sex discrimination and/or its proposed new sex discrimination against the team. LHU has announced imminent plays to downgrade the women's field hockey program from NCAA Division I to NCAA Division II status, which will downgrade the status, competitive schedule, and level of benefits provided to the team and its members.

25.    The proposed class meets the requirements of Fed. R. Civ. P 23(a)(2) because there are questions of law and fact common to the class members regarding whether LHU discriminates on the basis of sex in its (1) allocation of athletic participation opportunities and (2) allocation of treatment and benefits to varsity athletes

26.    Title IX itself is a class based statute, especially within the context of sex segregated educational programs like athletics, because no individual plaintiff has a claim unless the educational institution discriminates against the class of women as a whole.

27.    The proposed class representatives satisfy Fed. R. Civ. P. 23(a)(3) because their claims are typical of those of the proposed class. Like the proposed class, the representatives are being denied or imminently will be denied an equal opportunity to participate in varsity athletics at LHU because of LHU's ongoing sex

discrimination, and/or they are being denied or imminently will be denied an equal allocation of the treatment and benefits provided by LHU to varsity athletes.

28.    The proposed class representatives will fairly and adequately protect the interests of the class pursuant to Fed. R. Civ. P. 23(a)(4) because they will prosecute this action vigorously in order to obtain remedies for the entire class, whose interests they share.  Their lawyers have many years of experience in Title IX actions, class actions, and women's rights litigation.

29.    The student plaintiffs satisfy the requirements of Fed. R. Civ. P. 23(b)(2) because LHU behaves in a discriminatory way that is generally applicable to the entire proposed class. As a result, final declaratory and injunctive relief is appropriate with respect to the class as a whole.

## THE REQUIREMENTS OF TITLE IX

30.    Title IX, enacted in 1972, provides in relevant part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . .

20 U.S.C. § 1681(a).

31.    The Civil Rights Restoration Act of 1987 made plain Congress' intent that "program or activity," as used in Title IX, applies to any program or activity offered by an educational institution that receives federal financial assistance – whether or not the program itself receives such assistance.  20 U.S.C. § 1687.

Because LHU receives federal financial assistance, its athletic program is subject to Title IX and LHU must comply with its requirements.

32.     In the statute, Congress expressly delegated authority to the United States Department of Health, Education and Welfare (HEW) to promulgate regulations interpreting Title IX.  20 U.S.C. § 1682.  In 1975, HEW promulgated these regulations at 45 C.F.R. Part 86.  The United States Department of Education ("DOE") later adopted these regulations and codified them at 34 C.F.R. Part 106 (collectively, the "Regulations").  These regulations are enforced by the Office for Civil Rights (OCR) within DOE.  *See* Title IX Regulations at https://www2.ed.gov/policy/rights/reg/ocr/edlite-34cfr106.html.

33.     The Regulations require that federal fund recipients like LHU undertake remedial and affirmative efforts to eliminate sex discrimination.  34 C.F.R. § 106.3(a) & (b).  They further direct schools to evaluate their own policies and actions; to modify any policies and actions that are discriminatory; and to take remedial steps to eliminate the effects of discriminatory actions.  34 C.F.R. § 106.3(c).  These mandates apply whether or not anyone has complained about discrimination.

34.     On information and belief, Defendant has not undertaken sufficient remedial or affirmative action to remedy the historical and ongoing sex discrimination in its athletic program.

10

35.    The Regulations include a general prohibition against sex discrimination in 34 C.F.R. § 106.31(a):

(a)    General.  Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other educational program or activity operated by a recipient which receives Federal Financial assistance.

36.    The Regulations also include more specific prohibitions in 34 C.F.R. § 106.31(b) that state:

(b)  Specific prohibitions.  Except as provided otherwise in this part, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

(1)    Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;
(2)    Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;
(3)    Deny any person any such benefit or service;
….
(6)    Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit, or service to students or employees.
(7)    Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

37.     The Regulations also prohibit sex discrimination in the recruitment of students. 34 C.F.R. § 106.23(a):

(a)     Nondiscriminatory recruitment. A recipient to which this subpart applies shall not discriminate on the basis of sex in the recruitment and admission of students. A recipient may be required to undertake additional recruitment efforts for one sex as remedial action pursuant to §106.3(a), and may choose to undertake such efforts as affirmative action pursuant to §106.3(b).

38.     On information and belief, defendant has not undertaken sufficient remedial or affirmative recruiting efforts to ensure that it offers female students an equal opportunity to participate in varsity athletics; nor has it provided its women's teams with the resources necessary to adequately recruit female athletes with NCAA Division I athletic skills.

39.     The Regulations include a provision specifically directed to intercollegiate athletics. 34 CFR § 106.41(a) states:

(a)     General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person, or otherwise be discriminated against in any interscholastic, intercollegiate, club, or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

40.     The Regulations also identify ten (10) non-exclusive areas in which recipients must provide equal athletic opportunity, including:

1.     Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

2.     The provision of equipment and supplies;

3.    Scheduling of games and practice time;

4.    Travel and per diem allowance;

5.    Opportunity to receive coaching and academic tutoring;

6.    Assignment and compensation of coaches and tutors;

7.    Provision of locker rooms, practice and competitive facilities;

8.    Provision of medical and training services;

9.    Provision of housing and dining facilities and services; and

10.    Publicity.

34 C.F.R. § 106.41(c).  A school's "failure to provide necessary funds for teams for one sex" also may be indicative of sex discrimination.  *Id*.

41.    In 1979, OCR issued a Policy Interpretation on Intercollegiate Athletics, 44 Federal Register 71,413 (1979) (the "Policy Interpretation"), which provides that, in order to comply with Title IX and 34 C.F.R. § 106.41(c), schools must provide equal athletic opportunities in three general areas:  (1) athletic participation (34 C.F.R. §106.41 (c)(1), (2) athletic benefits to those who already have athletic participation opportunities (34 C.F.R. §106.41(c)(2)-(9)), and (3) athletic financial assistance (34 C.F.R. §106.37).  *See* Policy Interpretation, 44 F.R. at 71,414 at https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html.

42.    According to the Policy Interpretation, the Regulation "requires institutions to accommodate effectively the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports and the levels of competition available to members of both sexes."  Policy Interpretation, 44 F.R. at 71317.  "Institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities."    Policy Interpretation, 44 F.R. at 71318.

43.    Courts universally apply the Policy Interpretation's "Three Part Test" for assessing equity in the allocation of athletic participation opportunities:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

> (2) Where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

> (3) Where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*See* 44 Fed.Reg. 71,418.

44.    Countable participants for Prong One of the Three-Part Test are those student athletes:

14

a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season: and

c. Who are listed on the eligibility or squad lists maintained for each sport, or

d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

Policy Interpretation, 44 Fed. Reg. at 71,415.

45. The Three-Part Test was further clarified after notice and comment in OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the 1996 OCR Clarification). *See* the 1996 OCR Clarification at https://www2.ed.gov/about/offices/list/ocr/docs/clarific.htm

46. The 1996 OCR Clarification explains the meaning of each prong of the Three Part Test. For Prong One, it explains the meaning of substantial proportionality not just in terms of the percentage deviation of female athletic participation from female enrollment but in terms of the athletic opportunities required to close the discriminatory participation gap.

47. The Prong One analysis begins with a review of the number of athletic participation opportunities provided to students of each sex. That number is then compared to the number of athletic participation opportunities that the school should have provided if enrollment and athletic participation were proportionate. If that

participation gap is larger than the size of a new sports team, then the school does not comply with Prong One of the Three Part Test.

48.     Prong Two requires that a school have a history of athletic program expansion and that it engage in a continuing practice of program expansion until it reaches Prong One compliance or until it fully and effectively accommodates the athletic interests of its under-represented female students.

49.     A school that eliminates women's sports teams or other athletic opportunities cannot rely on Prong Two.

50.     Prong Three requires that a school fully and effectively accommodate the interests and abilities of its under-represented female students.  This means that it must keep adding opportunities for women with the interest and ability to participate until the school reaches Prong One equity.  In other words, so long as there are female students who want to participate in sports that the school does not have, the school must add those sports until it reaches Prong One equity.

51.     In 2010, OCR issued guidance on the meaning of Prong Three and how an institution can demonstrate that it fully and effectively accommodates the athletic interests of the under-represented sex.  The guidance took the form of a Dear Colleague letter issued April 20, 2010 ("OCR Prong Three Guidance").  *See* Intercollegiate Athletics Policy Clarification : The Three-Part Test – Part Three at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100420.html.

52.    The OCR Prong Three Guidance (at p. 5) states that schools must assess the athletic interests of their students in ways that are not discriminatory and that take into account the nationally increasing levels of women's interests and abilities in athletics.  The assessment must be frequent enough so that schools "identify in a timely and responsive manner any developing interests and abilities of the under-represented sex."  *Id*. at p. 7.

53.    The OCR Prong Three Guidance (at p. 6) states that in assessing interest, schools should consider, among other things: (a) requests by students and admitted students that a particular sport be added; (b) requests for the elevation of an existing club sport to intercollegiate status; (c ) participation in club or intramural sports; (d) interviews with students, admitted students, coaches, administrators, and others regarding interests in particular sports; ( e) results of surveys or questionnaires; (f) participation in interscholastic sports by admitted students; and (g) participation rates in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students.

54.    If an institution recruits potential student athletes for its male teams, then "it must ensure that its women's teams are provided with substantially equal opportunities to recruit potential student athletes."  *Id*. at p. 4.

55.    A school that eliminates a women's team or qualified female athletes cannot rely on Prong Three.

56.    The Policy Interpretation also includes a "competition test" which requires that schools provide existing teams with comparable levels of competition. In particular, it reviews institutional compliance based upon:

(1) Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; or

(2) Whether the institution can demonstrate a history and continuing practice of upgrading the opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

Policy Interpretation, 44 F.R. at 71418.

57.    The Policy Interpretation explains the meaning and application of the athletic treatment and benefits factors set forth in 34 C.F.R. §106.41(c).  It also addresses inequities in recruitment and support services.  44 F.R. at 17415 – 17417.

58.    Title IX delegates to DOE the authority to investigate and enforce the statute.  20 U.S.C. §1682.  OCR within DOE uses the guidelines described above when it investigates and enforces the Title IX statute.  OCR also provides its guidance materials to all recipients and makes them available on its website (www.ed.gov/ocr).  All of the federal courts of appeal that have considered these athletic regulations and guidance have afforded them substantial deference.

59.    The Regulations required compliance with the athletics requirements "as expeditiously as possible but in no event later than three years from the effective

date of this regulation." 34 C.F.R. § 106.41(d).  That compliance deadline was in July 1978.

60.    The Regulations further require that recipients confirm and promise Title IX compliance by filing an Assurance of Compliance with DOE each time they apply for or receive federal financial assistance, as a condition precedent to receipt of federal funds.  34 C.F.R. § 106.4.  The Assurance is a condition precedent to the receipt of federal funds.

61.    On information and belief, LHU has completed and submitted many Assurance of Compliance forms to DOE and has received federal funds from DOE even though its athletic program has *never* complied with Title IX.

62.    On information and belief,  LHU did not comply with the athletic regulations by the 1978 compliance deadline or at any time thereafter.  Today, 45 years later, LHU still does not fully comply with Title IX.

## FACTS

### LHU's History of Non-Compliance with Title IX's Three-Part Test

63.    LHU currently sponsors 8 men's varsity athletic teams and 10 women's varsity athletic teams.

64.    Most of LHU's athletic teams compete at the NCAA Division II level of competition.  However, LHU currently sponsors one men's team (wrestling) and

one women's team (field hockey) that compete at the higher, more competitive NCAA Division I level of competition.

65.    LHU has sponsored men's wrestling at the NCAA Division I level since 1974 and has continuously sponsored women's field hockey at the NCAA Division I level since 2004.

66.    LHU sponsors men's NCAA Division II teams in baseball, basketball, cross country, football, soccer, and track (indoor and outdoor).  LHU sponsors women's Division II teams in basketball, cross country, lacrosse, soccer, softball, swimming, volleyball and track (indoor and outdoor).

67.    LHU has never been compliant with Title IX's Prong One test requiring proportionality between the percentage of full-time enrolled students and athletic participants.

68.    LHU is required to annually prepare and make publicly available a report of athletic equity data in October of each year pursuant to the 1994 Equity in Athletics Disclosure Act (EADA), 20 U.S.C. § 1092(g).  LHU submits these reports to the U.S. Department of Education (DOE), which makes them publicly available on the EADA website.  LHU is also obligated to provide them upon request.

69.    LHU's own self-reported EADA data indicates that for each and every academic year from 1995-96 through 2015-16, LHU failed to provide equal athletic opportunities to its female students.   The number of athletic participation

opportunities it provided to female students was never substantially proportionate to women's full time undergraduate enrollment. According to LHU's own EADA reports, the percentage of full-time undergraduate female students during those years far outpaced the female athletic population by at least 4.93 percent and as much as 17.4 percent, for participation gaps as large as 226 opportunities when measured by the duplicated count of athletes and as large as 184 opportunities when measured by the unduplicated count of athletes.[1] *See* Pls. Exs. A and B, Charts Summarizing LHU's EADA Athletic Participation Using Duplicated Count and Unduplicated Count.

70.    According to LHU's most recent 2015-2016 EADA report, the number of opportunities needed to close the participation gap was 92 (duplicated) and 96 (unduplicated). *Id*. These numbers mean that LHU denied over 90 women the opportunity to participate in intercollegiate athletics last year alone because of sex discrimination.

71.    LHU's large participation gaps every year since it was required to report data to DOE have resulted in LHU denying thousands of female students athletic participation opportunities because of sex discrimination for more than 20 years.

---

[1] The unduplicated count reflects the actual number of student-athletes. The duplicated count actually counts athletes more than once if they participate in more than one sport.

72.    On information and belief, LHU's full-time female enrollment for the 2016-17 academic year is 56 percent of the 3522 full time undergraduate enrollment. Therefore, it should provide 56 percent of its athletic participation opportunities to female students.

73.    Although the 2016-17 academic year is not complete and not all data is final, available LHU data demonstrates the persistence of an athletic opportunity gap for female students whether measured by LHU's Roster Management Plan, or on-line rosters.

74.    According to LHU's most recent 2017 Roster Management Plan 2017-2022, women receive only about 51 percent of athletic opportunities in 2016-2017, resulting in a gap of almost 5 percent and the need to add at least 62 opportunities to achieve compliance with Title IX's participation requirement. *See* Pls. Ex. P, Pat Rudy Decl., Roster Management Plan 2017-2022 attached thereto as Ex. B; Pls. Ex. C, 2016-17 LHU Athletic Participation Based on March LHU Roster Management Plan 2017-2022;

75.    Analysis of LHU's 2016-17 on-line rosters suggests a participation gap of 4.75 percent and the need to add at least 57 female athletic opportunities. *See* Pls. Ex. D 2016-17 Athletic Participation Based on LHU On-Line Rosters.

76.    On information and belief, LHU's actual participation gaps are even larger, because LHU's women's rosters are inflated due to roster management

minimums for women's teams and the inclusion of women on rosters who do not meet the definition of participant set out in the 1979 Policy Interpretation and the 1996 Clarification. *See infra* at ¶¶ 72-87.  Discovery is needed to determine exactly how many women are countable as female athletes.

77.    Under the 1996 OCR Clarification, because LHU's athletic participation gap exceeded the size of a team each and every year for at least the past 22 years, it should have added more women's sports teams until it closed the participation gap. 1996 OCR Clarification, Three-Part Test, Part 1.

78.    LHU lacks a continuing history and ongoing practice of expanding athletic opportunities for its female students.

79.    LHU's men's teams were established between 1893 and 1957. Its women's teams were established between 1941 and 1994.

80.    Despite LHU's longstanding discrimination in athletic participation, as reflected in its persistent participation gap, LHU has not added a new women's sport since 1994 – more than 22 years ago.  It last added new sports for women in 1990-91 when it added volleyball and in 1994-95 when it added soccer.  In the same time period it eliminated women's gymnastics (1989-1990) and women's tennis (1992-1993).

81.    LHU does not fully and effectively accommodate the athletic interests of its female students or the proposed class.  For example, even though Pennsylvania

female high school students, from whom LHU draws its student body, participate in golf, tennis, bowling, and gymnastics, LHU does not offer these athletic opportunities. LHU does not even offer all the sports sponsored by its own athletic conference – a conference that includes other Pennsylvania state schools. The Pennsylvania State Athletics Conference (PSAC) sponsors women's golf and tennis, but LHU does not.

82.    LHU has refused to respond to demonstrated interest and ability in additional women's varsity sports. It refused multiple requests to elevate established and competitive women's club wrestling and women's club rugby to varsity between 2008 and 2013, despite a recommendation of the Athletics Advisory Board to add women's rugby as a varsity sport on March 14, 2013. It has refused to add varsity teams for women's bowling, golf, and tennis despite significant interest demonstrated athletic interest surveys conducted by LHU in 2015 of both current and incoming students. *See* Pls. Ex. E, LHU Athletics' Dept. Proposed Realignment Plan Mar. 6, 2017, App. D; Pls. Ex. F Athletics Advisory Board Minutes 3-14-13.

83.    LHU women's rugby, established in 1993, continues as a competition club sport at LHU and continues to grow and excel and has still not been promoted to varsity status.

84.    LHU's failure to provide equal opportunity for female students by adding varsity sports in its athletics program has harmed female students who do not

now play varsity sports but want to, as well as current, prospective and incoming female students, by deterring them from participating in athletics and narrowing their athletic options.

85.    On information and belief, the only actual plan LHU has ever adopted for achieving equity in athletic participation is a 1993-1998 plan which called for a female athletic participation rate of 50 percent.  LHU has never reached this goal. Nor would a 50 percent athletic participation rate be equitable given that LHU's female enrollment historically exceeds 55 percent.

86.    Despite decades of inequity, LHU has failed to remedy its discrimination and has ignored gender equity recommendations provided to it.  For example, in 2002, a committee headed by LHU assistant athletic director Peter Campbell recommended that LHU take steps to achieve gender equity, by *inter alia*, adding new women's sports, surveying student athletic interest and ability, remedying coaching inequities, and elevating women's field hockey to match the already existing men's Division I wrestling team.  On information and belief, the only recommended action that LHU took was the elevation of women's field hockey to Division I.

87.    In 2010, former NCAA president and University of California - San Diego athletic director Judith Sweet reviewed LHU's athletic program and recommended that it create a gender equity committee to evaluate women's athletic

participation opportunities and interests and the treatment of women's teams on a regular basis and that it make adjustments as warranted.

88.    In April 2014, the Women's Law Project filed a complaint with the U.S. Department of Education Office for Civil Rights (OCR) alleging LHU's violation of Title IX's participation requirements.

89.    In June 2014, LHU retained, Alden & Associates to perform a Title IX review of its intercollegiate athletics program.  This review concluded that LHU failed to meet any part of the athletic participation Three-Part Test and noted that its roster management practice of adding more women to existing teams was inadequate to comply with Title IX in the long term.  It also identified additional Title IX violations relating to locker rooms, *See* Pls. Ex. G. Alden & Association Summary & Recommendations.

90.    On September 12, 2014, LHU President Michael Fiorentino entered into a Voluntary Resolution Agreement with OCR in which he agreed to bring LHU into compliance with Title IX's participation requirement.

91.    To date, LHU has failed to comply with the Voluntary Resolution Agreement and has not achieved compliance with any part of Title IX's Three-Part Test for participation.

92.    Despite decades of participation gaps as large as 226 and despite repeated warnings of noncompliance, LHU has not added any new women's sports in more than 20 years.

93.    Instead, it created a "roster management" plan designed to inflate the rosters sizes of women's teams beyond the needs of the teams in order to make LHU's EADA numbers look better.  Yet, even with the inflated rosters, LHU's EADA reports still how large participation gaps.

94.    Under LHU's roster management plan, LHU required the coaches of women's teams to add more women to their rosters to meet an arbitrary minimum squad size, whether or not doing so was in the best interests of the team.  Coaches were required to find new athletes for their teams even if they thought doing so was or would be harmful to them.

95.    The roster management arbitrary minimum women's squad sizes mandated by LHU exceed the average squad sizes for NCAA Division II schools. *See* Pls. Ex. H, Comparison Chart.

96.    The roster management arbitrary minimum women's squad sizes mandated by LHU also exceed the travel squad size limits for NCAA post-season competition.  This means that if LHU qualifies for post-season play, not all of its female athletes can participate, because the team sizes exceed the travel limits.  This is another indicator that the squad sizes are unreasonably large.

97.    On information and belief, the large roster management mandates for the women's teams exceed the needs of those teams and are harmful to them.

98.    On information and belief, LHU has not added more coaches, more scholarship money, more athletic benefits, or more recruiting dollars to accommodate the excessively large women's squad sizes.

99.    On information and belief, the squad sizes of several of the women's teams exceed the needs of the team and the desires of the coaches who now must supervise and coach more athletes without receiving more pay or the help of more assistant coaches.

100.    LHU's mandated roster increases for years 2017-2022 far exceed the NCAA averages and NCAA post season travel squad limits for women's cross country, track, lacrosse, soccer, and softball.  The roster management numbers for men's teams, on the other hand, are equal to or below NCAA average squad sizes and, except for football, close to NCAA maximum championship team sizes. *See* Pls. Ex. H, Comparison Chart.

101.    LHU's roster management plans for this year still do not satisfy Prong One of Title IX's Three Part Test, even though several women's teams exceed NCAA squad size averages.

102.   LHU's roster management plans for future years also do not satisfy Prong One of Title IX's Three Part Test, even though they also require the women's teams to carry more athletes than NCAA squad size averages.

103.   LHU has manipulated the roster sizes for track teams in particular, requiring 48-50 track athletes, whom it then counts twice for the indoor and outdoor track seasons.  This number is far above the NCAA Division II averages of 31.3 athletes for indoor track and 30.1 for outdoor track.  It is also far above the 28 athletes that LHU proposes for its men's track team.

104.   On information and belief, LHU's roster mandates have resulted in the listing of female athletes on rosters who are not actually members of the teams.  For example, approximately 15 of the 45 women listed on LHU's 2016-17 online cross country roster are not participating in cross county; they are only members of the women's indoor and outdoor track teams. Approximately 7 of 45 women listed on LHU's 2016-17 on-line rosters for women's indoor and outdoor track are not members of those teams.

105.   The addition of female athletes to meet roster management minimums deprives female athletes of equal coaching opportunity without increased coaching resources.

106.   The addition of female athletes to meet roster management minimums deprives female athletes of equal opportunity to compete.

107.   Too many athletes on a team is also harmful to athletes and the team because it disrupts team dynamics, reduces practice opportunities for team members, requires the addition of unskilled players to a team whose lack of skill may cause injury to themselves or others and who will become disgruntled and quit when they do not get playing time.

## Discriminatory Treatment of Women's Swim and Field Hockey Teams

108.   Despite its continuing failure to provide equal athletic participation opportunities to its female student body or otherwise to comply with Title IX's athletic participation requirements, LHU recently initiated a series of discriminatory actions that will exacerbate its existing sex discrimination.  These actions will lead to the imminent elimination of the women's swimming program and the downgrading of the women's field hockey to Division II.

109.   In January 23, 2017, LHU Vice President Rodney Jenkins announced its intent to eliminate men's indoor and outdoor track and women's swimming and to demote women's Division I field hockey to Division II to save money.  Despite decades of discrimination against women and decades of failing to add new women's sports to respond to the interests and abilities of its female students, LHU decided to eliminate a women's team and downgrade another women's team.  *See* Pls. Ex. I Lock Haven University Athletics' Department Proposed Realignment Plan (Jan. 23, 2017).

110.   The LHU community protested LHU's proposed elimination of women's swimming and demotion of field hockey.

111.   On March 6, 2017, LHU announced a revised plan and undertook immediate action to de facto eliminate the swim team and demote field hockey to NCAA Division II. *See* Pls. Exs. E, LHU Athletics Department Proposed Realignment Plan (March 6, 2017), J, and K.

112.   Under the revised plan, LHU will not immediately eliminate the women's swim team but will take actions that will soon lead to the same result.

113.   On information and belief, these actions against the women's swim program include: immediate removal of the experienced full-time head swim coach; no prompt replacement of the head coach but instead delayed replacement of the head coach, at the earliest, by July 1, 2017; replacement of the full-time head coach with only a part-time head coach; reduction of the swim team's meet schedule to the NCAA minimum of 8, and efforts to limit those meets to home meets.  LHU also refused to commit to keeping the swim team beyond the next academic year.

114.   On information and belief, the planned action against the field hockey team includes temporarily delaying demotion of the field hockey team for one year, with the possibility of reconsideration if its members fundraise enough to pay more of the team's expenses, but no guarantee that the team will not be demoted.

115.  On March 23, 2017, LHU modified its plan to eliminate only men's indoor track and not men's outdoor track also.  *See* Pls. Ex. L.  Because the same male track athletes run both indoors and outdoors, no males will actually lose the opportunity to participate in track.  The same male track athletes will still practice the same number of days during the academic year, will still be coached by the same number of coaches, will still receive the same amount of athletic aid, and will still be able to run in the same number of track meets.  The NCAA allows athletes to participate in 18 meets (whether indoors, outdoors, or both).

116.  Financial constraints are not a defense to a violation of Title IX.  Whatever an institution's athletic budget is, it must distribute those resources in a manner that leads to equity in participation, benefits, and athletic aid.

117.  On information and belief, the actions LHU plans to take will not bring LHU into compliance with Prong One of the Three-Part Test or close the gender participation gap.

118.  On information and belief, the elimination of women's swimming and demotion of field hockey will not achieve the financial savings LHU claims will be achieved.

119.  On information and belief, the harm to the women's swim and field hockey teams will far outweigh the minimal, if any, savings from the stated changes to the teams.

**LHU Actions Will Lead to the Imminent Demise of Women's Swimming
and Irreparable Harm to LHU Swimmers**

120.  LHU started to implement its plan to diminish the women's swim program on March 6, 2017;

121.  On that date, LHU fired the women's swim coach effective immediately. *See* Pls. Ex. M

122.  LHU administrators also refused to commit to keeping the swim team beyond the next academic year.

123.  LHU administrators also announced they would not replace the head coach immediately but that one would be in place by the beginning of the next season.

124.  The fired women's swim head coach had opposed LHU's plans to eliminate or downgrade the women's swim program.

125.  When the head coach was fired, work for the year had not been completed; this work included recruitment for 2017-18 which would have continued into August, scheduling of meets for the next year by entering into commitments about dates and times with coaches of other teams, and fundraising through swim clinics and swim lessons in the spring, and a summer camp for which preparations must be made and advertisements posted.

126.  On information and belief, none of this unfinished business has been completed.

127.   LHU also announced that it does not intend to replace the swim team's head coach with a full-time coach.

128.   Instead, LHU posted an ad for a part-time head coach with an anticipated start date of July 1, 2017. *See* Pls. Ex. N.[2]

129.   It is not possible for a part-time head coach to adequately perform the necessary functions of leading a college varsity athletic team.

130.   LHU will harm the female swimmers and the women's swim program if it provides only a part time head coach.

131.   No LHU men's team has only a part-time head coach.

132.   On information and belief, LHU has never taken any such actions against any men's teams.  To the contrary, while removing the women's swim team coach with no immediate replacement, LHU has posted advertisements for the immediate hire of two full time assistant coaches for its men's football team, a team already staffed with 9 coaches. *See* Pls. Ex. O.

133.   On information and belief, LHU intends to reduce the swim team's meet schedule to the NCAA minimum of 8, which is half the 16 allowed by NCAA rules and scheduled by most NCAA Division II teams.

---

[2] After plaintiffs' counsel provided LHU counsel with an advance copy of the complaint, LHU reposted the job as a full-time position on May 30, 2017. The position remains unfilled and it is unknown whether LHU will or will not hire a full-time coach.  .

134.   On information and belief, LHU intends to require that most if not all women's swim contests be held at home.

135.   These changes in the swim meet schedule will damage the swimmers and the program, decreasing program and swimmer development, reducing the swimmers' opportunities to qualify for championships, harming the team's reputation and impeding recruiting.

136.   LHU's discriminatory actions have already harmed the future of the swim team.  As a result of LHU's actions proposing to eliminate the team, firing the head coach and leaving the team without a head coach for the remainder of the year when critical recruitment and scheduling must be done, and refusing to commit to the team beyond the next year, serious swimmers have fled from the program.  A number of current swim team members are strongly considering transferring to another university to assure their continued ability to participate in a strong and supported swim program that is treated like the varsity sport it is.  Approximately 3 athletes from this year's team already have decided to transfer to other schools so that they can compete for truly varsity programs.  Others may be too far along in their academic careers to transfer schools but may not participate on the team next year as a result of LHU's actions.

137.   At least thirteen of fourteen swimmers recruited for next year's team have decided to attend other schools that treat their swim programs more like varsity programs and that provide them with more opportunities to develop and compete as swimmers.

138.   Two swimmers who signed early National Letters of Intent to swim at LHU starting next year have asked for and received releases from their commitments so that they can attend schools with more stable swim programs.

139.   On information and belief, no other schools with women's swim teams in LHU's athletic conference limit their schedules to half the meets allowed by NCAA rules.

140.   On information and belief, no other schools with women's swim teams in LHU's athletic conference have less than a full-time head coach.

141.   On information and belief, no other schools with women's swim teams in LHU's athletic conference have lost almost all of their recruits for next year.

142.   LHU's actions are certain to lead to the swim team's imminent demise. With four team members graduating in June 2017, current team members in the process of pursuing transfers, and at most one new freshman swimmer, the swim team is at serious risk of not meeting NCAA minimum requirements of 11 swimmers and being eliminated.

143.   Even if the swim team can hold on for another year, with so few athletes, it will not be able to compete in as many events, score as many points in meets, and win meets.

144.   Under LHU's new plan, only female athletes – female swimmers – will be limited to the minimum number of NCAA competitions, which violates the Policy Interpretation's competition test.

145.   As a result of the limitations LHU has placed on coaching and meets and the ongoing uncertainty of the team's future, the women's swim team will be unable to recruit new athletes in the future, so if it does not disappear entirely now, it will soon through attrition.

146.   LHU's women's swim team, started in 1974 as a club team and elevated to a varsity team sport in 1976, is currently a viable, competitive team.

147.   Plaintiffs members of the swim team highly value their participation on the LHU swim team and were either recruited or joined the team upon arrival at LHU.

148.   Accomplished, competitive swimmers their entire lives, current swim team members are dedicated to the team and were shocked and upset when LHU announced its intention to cut their team.  Swimming is very important to them and they had expected to swim at LHU for all four years when they came to LHU.  They

protested the elimination of the team and urgently want the team to continue with the full support and benefits to which a varsity team is entitled.

149.    With one to two years of athletic eligibility remaining in their academic lives at LHU, plaintiffs are very concerned about the uncertain future of the team as a result of LHU's refusal to commit to keeping their team after the 2017-18 academic year and the discriminatory actions taken by LHU against their team, including taking away their Florida training trip this year, firing their coach and leaving them without a coach for many months, planning to replace the full-time head coach with only a part-time coach, and reducing the number of scheduled competitions.

150.    They do not want to lose their skills and competitive opportunities, and they do not want their team to disintegrate due to LHU's discriminatory changes to the team.

151.    They reasonably fear LHU's actions will deter new swimmers from joining the team, placing the future of the team at risk, because they know some current team members are transferring from LHU and previously recruited swimmers are going to other schools instead of LHU.

152.    The loss of the swim team results in the loss of life-long benefits for students, including improved academic performance, stronger work ethic, better time management, and enhanced social skills that will prepare them for the working world and make them better candidates for jobs.

153.    If LHU is determined to have violated Title IX and ordered to reinstate the swim team after the team has already been decimated, it will take an enormous effort to restore it to its 2016-17 number and quality of participants.  The athletes will have graduated or transferred, and a whole new team would have to be recruited. It would take between three and four years to bring the team back to its current level.

**LHU's Field Hockey Plan Will Make Demotion to Division II Inevitable and Cause Irreparable Harm to the Team and Its Members**

154.    LHU currently sponsors one women's NCAA Division I team and one men's NCAA Division I team: Women's Field Hockey and Men's Wrestling.

155.    Women's Field Hockey was elevated to NCAA Division I in 2004 as a result of a 2002 recommendation of the Title IX Committee in order to achieve gender equity in level of competition afforded men and women.

156.    LHU's revised plan delays the immediate demotion of field hockey to Division II for one year, during which field hockey must engage in extensive fundraising to pay its own expenses to remain Division I.  LHU will make a final decision on the team's status at the end of the year.  LHU has given no guarantees that it will not demote field hockey regardless of how the team fares with respect to fundraising, performance, or any other factors.

157.    On information and belief, LHU is choosing to demote women's field hockey and not men's wrestling even though women's field hockey has had a better

win-loss record than men's wrestling since 2004-05. *See* Pls. Ex. P, Pat Rudy Decl., Ex. A. Comparison Wins/Losses Field Hockey and Wrestling.

158.  If women's field hockey is demoted to NCAA Division II, the only NCAA Division I team at LHU will be the men's wrestling.  There will be no women's team competing at the same level of competition as men's wrestling.

159.  LHU's conditioning women's field hockey's Division I status on increased fundraising to support itself is inequitable.

160.  LHU has not conditioned wrestling's maintenance of Division I status on fundraising from outside sources.

161.  LHU has provided significantly more publicity and fundraising support to men's wrestling to than it has provided women's field hockey or any women's team.

162.  On information and belief, no LHU women's team has received the level of publicity and fundraising support LHU provides to wrestling.

163.  Because LHU has always provided greater resources to its Division I teams, the demotion of field hockey to Division II will mean that, men's wrestling will be the only team that will benefit from the additional resources.

164.  The anticipated demotion of women's field hockey to Division II in 2018-19 will immediately adversely affect recruiting for 2017-2018 and 2018-19. Student-athletes who want a Division I experience will not choose LHU.

Prospective recruits and their parents are asking questions about the team's status as they consider where to go to school. Approximately 5 recruits have been lost to other schools already. It will be difficult to repopulate the team as students graduate or transfer.

165.   If Division I athletes do not join the LHU team, lesser skilled athletes may join and will not perform as well and the team will not win, damaging the team's reputation.

166.   The specter of demotion of field hockey to Division II status and the team's damaged reputation will have a negative effect on fundraising.

167.   With the team's classification up in the air, it will also be difficult to schedule competitions with Division I teams because they will not want to compete with a Division II school.

168.   On information and belief, if the Court does not enjoin LHU's plan now and LHU demotes field hockey to Division II before this case is tried, it will be extremely difficult if not impossible to reinstate the team to Division I later. The NCAA no longer allows colleges to offer new multi-division programs with different sports in different divisions. Schools with existing multi-division programs can continue, but new schools cannot become multi-division, and existing schools cannot add new programs to Division I status.

169.   NCAA rules do not provide a process for schools that demote their teams to Division II to subsequently re-elevate them to Division I.  LHU would have to somehow obtain a waiver from current rules to petition for return to Division I status.  There are no rules for such waivers.

170.   If the NCAA were to grant a waiver allowing LHU to petition for return to Division I status, the process is unclear. In the past, the process to upgrade to Division I status included providing the NCAA with written notice of intent to reclassify and completion of an application that includes an extensive strategic plan detailing LHU's commitment to the Division I philosophy and performance program principles, and payment of a fee.  The process took two years, during which time the team seeking Division I status was not permitted to participate in NCAA championships either at Division I or Division II.  *See* NCAA Division I Manual Aug. 2016-17, at 20.4.

171.   Reinstatement to Division I status would also require LHU to seek reinstatement to the Atlantic 10 Conference or find another conference to join. Reinstatement to Division I status and to the Atlantic 10 or any other Division I conference would be hampered by the lack of commitment to Division I LHU showed when it demoted field hockey to Division II and the loss of Division I level athletes caused by the demotion to Division II.  Finding a Division I Conference to accept LHU field hockey would be extremely difficult.  As a multi-division school

(having both Division I and II sports) LHU field hockey is always an affiliate Division I conference member for which the conference would have to make special adjustments and accommodations.

172.   Athletes will be harmed if field hockey is demoted to Division II.

173.   All of the plaintiff field hockey athletes elected to attend LHU precisely because LHU offered them the opportunity to compete on a Division I varsity field hockey team.

174.   All of the plaintiff field hockey players were recruited.  If LHU field hockey had been Division II, they would not have even considered it.

175.   They all played field hockey most of their lives and are exceedingly accomplished in the sport, having excelled in competition and received honors and awards in their sport.

176.   Division I field hockey is qualitatively different from Division II field hockey in terms of its competitiveness and challenges.  For players who have dedicated the time and effort developing the skills attained by the plaintiffs, Division I is the only option.  Playing a lower division with lesser skilled team members and opponents will harm their skill development and their ability to grow as athletes.

177.   All of the plaintiff student-athletes will continue to be eligible to compete in their sport for anywhere from one to three more years under applicable rules.   All will continue to participate on the field hockey team if it remains Division I.

178.   Plaintiff field hockey players were shocked when they learned LHU was proposing demoting field hockey to Division II and not demoting the men's wrestling team, the other Division I team.

179.   When they were told by the President that Division II would be a better fit, they were upset that he questioned their competitiveness when they knew they performed better than the wrestling team and that they were unquestionably deserving of Division I status.

180.   Some field hockey players receive full scholarships and will not be able to continue at LHU without a full scholarship.   Because the NCAA allows Division II schools to offer fewer athletic scholarships than Division I schools, some student-athletes may have to leave LHU if they do not receive sufficient financial support.

181.   The field hockey players are worried about the team's future.   The cloud of demotion hanging over the team will immediately hurt recruiting and harm the team, its competitiveness, its ability to win, and its reputation.   Athletes who want a Division I experience will not come to LHU.

182.   Whether they will have to leave or stay, the field hockey players will experience a loss if their team is demoted.  Division I was their dream.

183.   If the team is demoted, the competitions will be less competitive and team skill development will be hurt.

184.   Continuing their education at LHU without the Division I field hockey places the plaintiffs at risk of losing their athletic skills and the enjoyment they derive from competing at the highest level.  It also deprives them of the growth, excellence, and successes that come with participating on the same team for four consecutive years, and negatively affects their chances to attain their dreams of becoming coaches and other professionals whose work involves the skills gained playing field hockey.

185.   As a result of LHU's unlawful actions, plaintiffs and class members have suffered and will continue to suffer lost educational opportunities and benefits, including the imminent loss of the opportunity to participate in the soon to be eliminated women's swim team and soon to be demoted women's field hockey team.

### Discrimination In Treatment, Benefits, And Recruitment

186.   On information and belief, LHU's men's locker rooms are substantially better than women's locker rooms.

187.   On information and belief, LHU built the football team its own separate facility and provided the Division I wrestling team with a spacious locker room with

large, pro-style wooden lockers.  All men's locker rooms have all the amenities, including bathrooms with toilets and showers.

188.   On information and belief, the women's Division I field hockey locker room lacks the most basic amenities as it lacks toilets and showers.

189.   On information and belief, each men's team has its own exclusive locker rooms which they are not required to share with another LHU team or a visiting team.

190.   On information and belief, until recently, all women's teams shared locker rooms with other teams.  Not until last year was Division I field hockey team given its own locker room.  While the softball team was assigned an exclusive locker room for the first time in 2016-17, the team must vacate it with all their possessions when visiting football teams compete at LHU and use their locker room.

191.   On information and belief, men's teams have a lower coach to student ratio than the women's teams and men therefore receive more access to coaching and other staffing resources than women's teams.

192.   The reduction of the women's swimming head coach from full-time to part-time will further reduce access to coaching for women.

193.   On information and belief, the use of roster management to increase the number of women on women's teams and cap men's teams contributes to reducing access to coaching and playing time for women athletes.

194.   On information and belief, LHU provides greater recruiting resources to men's teams than women's teams. LHU's most recent EADA report shows that in 2015-16, LHU allocated only 37.76 percent of its recruiting financial support to women's teams who made up 48.5 percent of the athletes while women make up 56 percent of the student body.  Recruiting funding provided to women's teams in previous years was insufficient to close the participation gap and certainly insufficient to meet LHU's required roster management minimum participation goals.  LHU's failure to provide equitable access to recruiting resources harms the women's teams because they are less able than the men's teams to recruit highly skilled athletes.

195.   On information and belief, greater publicity and university fundraising staff support is dedicated to men's teams than women's teams.

196.   On information and belief, the women's softball team has not had new uniforms in four years while the baseball team has received new uniforms annually.

197.   On information and belief, the women's swim team and softball teams were not permitted to take their planned annual training trips to Florida, despite having raised the necessary funds to cover trips.  Instead, LHU took control of their funds, cancelled the swim team training trip, and replaced the softball training trip with more geographically close competitions with lower caliber competition, depriving the team of the necessary level of training for their season competition.

198.    On information and belief, LHU did not deprive or interfere with the annual training trips of any men's teams.

199.    On information and belief, LHU schedules all men's teams the maximum numbers of athletic contests but schedules women's swim teams at less than the NCAA maximum number of athletic contests.

200.    LHU's planned reduction in the number of swim meets for the varsity swim team will exacerbate the scheduling disparities between men's and women's varsity teams.

## COUNT I:  TITLE IX – EQUAL ATHLETIC OPPORTUNITY

201.    Plaintiffs incorporate by reference paragraphs 1 through 180.

202.    LHU does not and never has complied with the Three Prong Test for equal athletic participation opportunity.  As LHU's own data shows, it violates Prong One in that it has never provided female students with substantially proportionate varsity athletic opportunities compared to what it has provided to its male students. Over the past 22 years, LHU's discriminatory participation gap has been as high as 226 (even assuming LHU's self-reported data is true).  Over the past 22 years, LHU has wrongfully denied nearly 3,000 women an opportunity to participate intercollegiate athletics.

203.    LHU violates Prong Two in that it has not added a new sport for women in 22 years and has refused requests to add new women's varsity sports.

204. Instead of adding women's opportunities, LHU has required its women's teams to carry an inflated number of athletes beyond the needs of the team, negatively impacting the athletic experience of female athletes while failing to achieve equity.

205. Even with roster inflation, LHU has failed to satisfy Title IX's Three Part Test for measuring equity in athletic participation.

206. LHU violates Prong Three in that it fails to fully and effectively accommodate the athletic interests and abilities of its current and prospective female students by failing to add teams for which there is interest and ability.

207. Despite its noncompliance with the Three Part Test, LHU has initiated actions that will lead to the elimination of the women's swim team unless enjoined.

208. Those same actions essentially demote the team to a less than full varsity status with a less than complete coaching staff and minimum schedule until the team disappears completely due to attrition.

209. LHU's plans for women's swimming violate the competition test, because only women's swimming – and no men's team -- will be downgraded to compete in the minimum number of meets required by NCAA rules.

210. LHU's de facto elimination of women's swimming and its refusal to add sports for which women have interest and ability establishes LHU's failure to fully and effectively accommodate the interests and abilities of female students.

211.   The discriminatory actions that LHU has undertaken with respect to women's swimming will result in the imminent elimination of women's swimming in violation of Title IX.

212.   These actions must be enjoined now before their consequences become irreversible.  Without immediate restoration of the full-time head coach to recruit and schedule contests, the opportunity to do so will be lost.

## COUNT II:  TITLE IX – DISCRIMINATION IN COMPETITION LEVEL

213.   Plaintiffs incorporate by reference paragraphs 1 through 192.

214.   Title IX requires equality between men and women athletes with respect to level of competition.

215.   LHU's discriminatory treatment of its NCAA Division I women's field hockey team will lead to its immediate demotion to NCAA Division II while wrestling remains NCAA Division I and therefore violates Title IX's competition test.

216.   LHU's limiting the swim team to the NCAA minimum number of contest violates Title IX's competition test.

## COUNT III: TITLE IX – ATHLETIC TREATMENT AND BENEFITS

217.   Plaintiffs incorporate by reference paragraphs 1 through 196.

218.   LHU has deprived women athletes of equal treatment and benefits in violation of Title IX.

219.   LHU discriminates against women as a whole with respect to coaching, scheduling, facilities, recruiting, publicity and fundraising support.

220.   LHU discriminates uniquely against the women's swim team, the only team for which LHU: (1) denied its annual training trip altogether; (2) removed its full-time head coach before the end of the year without replacing him, (3) allowed the team to complete the year without a head coach, (4) will be scheduling only the NCAA minimum number of contests, and (5) refuses to commit to retaining it beyond one more year.

221.   As LHU provides more benefits to its division I teams, men and only men will receive those extra benefits if LHU demotes women's field hockey to Division II.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court enter judgment in their favor and award the following relief:

(a)   Certify this action as a class action for declaratory and injunctive relief on behalf of all present, prospective, and future LHU female students who participate, seek to participate, or have been deterred or prevented from participating in intercollegiate athletics sponsored by LHU;

(b)    Declare that LHU has engaged in a continuing pattern and practice of discrimination against women on the basis of sex in intercollegiate athletics in violation of Title IX and its applicable regulations, policy interpretation, and clarifications;

(c)    Issue a temporary restraining order and preliminary injunction that prevents LHU from continuing with its new discriminatory plan and actions that harm women's swimming and field hockey.  Such order should: (1) enjoin LHU from eliminating the women's swim team; (2) enjoin LHU from taking actions that might lead to the de facto elimination of the women's swim team; (3) enjoin LHU from limiting the women's swim competition schedule; (4) order the immediate reinstatement of the women's swim head coach and/or hiring of a full time women's head swim coach; (5) require LHU to immediately take action to remediate the harm already caused by LHU's sex discrimination, including but not limited to immediate affirmative steps to recruit swim athletes and offering them financial assistance to the maximum amount allowed under NCAA rules; (6) enjoin LHU from demoting field hockey from Division I to Division II so long as any LHU men's team competes in Division I; (7) enjoin LHU from requiring the women's field hockey team to fundraise in order to remain in Division I; (8) require LHU to provide the women's swim team and field hockey teams with funding, staffing, recruiting resources, scheduling, and other benefits and services commensurate with their status as a

varsity team; and (9) prohibit LHU from retaliating in any manner against plaintiffs, class members, or any persons who advocate on their behalf for asserting their legal rights to equal opportunity.

(d)     After a hearing on the merits, issue a final injunction that: (1) makes permanent the requested injunction on behalf of the women's swim and field hockey teams; (2) requires LHU to add new women's teams to close its athletic participation gap to comply with Title IX ; (3) restrains LHU from requiring women's teams to inflate their rosters beyond the needs of the teams; (4) requires LHU to consider and report only athletes who meet the 1979 Policy Interpretation's definition of "participant" as athletes for purposes of assessing Title IX compliance; (5) requires LHU to eliminate inequities in the treatment and benefits provided to its men's and women's teams, especially in facilities, promotions, publicity, and other services (6) allocates sufficient recruiting resources to the women's teams so that they can recruit enough athletes to close the athletic participation gap; (7) restrains  LHU from continuing to discriminate against female students on the basis of sex; and (8) prohibits defendant from retaliating in any manner against plaintiffs, class members, or their supporters for asserting their legal rights to equal opportunity.

(e)     Award plaintiffs their costs and expenses, including an award of reasonable attorneys' fees;

(f)    Award such other and further relief as this Court deems just and proper.

Respectfully submitted,


/s/ Kathleen V. Yurchak, Esquire
Kathleen Yurchak, Esquire
Steinbacher, Goodall & Yurchak
328 South Atherton St.
State College, PA 16801
Tel: 814-237-4100
Email: yurchak@centrelaw.com


/s/ Terry L. Fromson, Esquire
*Terry L. Fromson, Esquire
WOMEN'S LAW PROJECT
125 S. 9th Street, Suite 300
Philadelphia, PA 19107
Tel: 215-928-5771
Fax: 215-928-9848
Email: tfromson@womenslawproject.org



/s/ Amal Bass, Esquire
*Amal Bass, Esquire
WOMEN'S LAW PROJECT
125 S. 9th Street, Suite 300
Philadelphia, PA 19107
Tel: 215-928-5772
Fax: 215-928-9848
Email: abass@womenslawproject.org

**FOR PLAINTIFFS**

Date:  June 2, 2017                        *Motion for Admission Pro Hac Vice Pending

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2017, I caused to be served a true and correct

copy of the foregoing Complaint upon the following by electronic mail:


Cathleen A. McCormack, Esquire
University Legal Counsel
Pennsylvania State System of Higher Education
2986 North Second Street
Harrisburg, PA 17110-1201
cmccormack@passhe.edu



/s/ Kathleen V. Yurchak, Esquire
Kathleen Yurchak, Esquire
Steinbacher, Goodall & Yurchak
328 South Atherton St.
State College, PA 16801
Tel: 814-237-4100
Email: yurchak@centrelaw.com