## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EMILY ROBB,<br>TARYN PIANO,<br>TAYLOR PLOUSE,<br>JACQUELYN BINGHAM,<br>TAMIA ROACH,<br>MACKENZIE FARLEY,<br>KAYLA BRATHWAITE, and<br>ALICE MARONEY,<br><br>       Plaintiffs,<br><br>  v.<br><br>LOCK HAVEN UNIVERSITY OF<br>PENNSYLVANIA,<br><br>       Defendant. | No. 4:17-CV-00964<br><br>(Judge Brann) |

## MEMORANDUM OPINION

### MAY 7, 2019

In January 2017, Lock Haven University revealed plans to eliminate its women's varsity swim team and to demote its women's varsity field hockey team from Division I to Division II.[1]  A few months later, Plaintiffs[2] initiated this class action lawsuit, alleging that the contemplated actions, along with other aspects of

---

[1]  Joint Case Management Plan ("JCMP"; ECF No. 46) at 6.

[2]  Plaintiffs are members of Lock Haven's varsity field hockey, varsity swim, and club rugby teams.  Amended Complaint (ECF No. 56) ¶¶ 6-14; Answer to Amended Complaint (ECF No. 62) ¶¶ 6-14.

Lock Haven's athletics program, discriminated against female student athletes in violation Title IX.

Pending before this Court are the parties cross-motions for summary judgment as well as Plaintiffs' motion to certify a proposed class.[3]  Because there are disputes of material fact, both motions for summary judgment will be denied.  And because the proposed class contains members with conflicting interests, the motion for class certification will be denied without prejudice.

## I.    OVERVIEW OF TITLE IX CLAIMS

Title IX states in part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[4]    Under one of that law's implementing regulations, universities must provide "equal athletic opportunity" for students of both sexes.[5]

---

[3]   Also pending is a motion, filed by Plaintiffs, asking this Court to reconsider its September 17, 2018 Order extending the discovery deadline and mooting previously filed summary judgment motions.  ECF No. 109.  That motion will be denied.

[4]   20 U.S.C. § 1681(a).

[5]   34 C.F.R. § 106.41(c).  This regulation indicates that a determination of whether a university provides equal athletic opportunities should be made after considering, *inter alia*:

(1)   Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
(2)   The provision of equipment and supplies;
(3)   Scheduling of games and practice time;
(4)   Travel and per diem allowance;
(5)   Opportunity to receive coaching and academic tutoring;
(6)   Assignment and compensation of coaches and tutors;
(7)   Provision of locker rooms, practice and competitive facilities;

In 1979, the Department of Health, Education, and Welfare issued a policy interpretation ("1979 Policy Interpretation") to "provide[] a means to assess an institution's compliance with the [regulation's] equal opportunity requirement."[6] According to that document, "equal opportunity" is measured in three areas: (1) athletic financial assistance; (2) equivalence in other athletic benefits and opportunities; and (3) effective accommodation of student interests and abilities. Plaintiffs do not challenge Lock Haven's distribution of athletic financial assistance. They do, however, argue that Lock Haven fails to otherwise provide equivalent benefits and opportunities to students of both sexes, and that Lock Haven fails to effectively accommodate the interests and abilities of students of both sexes.

## A.    Effective Accommodation—The Three-Part Test

The regulations ask whether universities' "selection of sports . . . effectively accommodate[s] the interests and abilities of members of both sexes."[7]  The 1979 Policy Interpretation indicates that compliance in this area is measured, *inter alia*, by querying:

(8)    Provision of medical and training facilities and services;
(9)    Provision of housing and dining facilities and services; [and]
(10)  Publicity.

[6]    Office for Civil Rights, Department of Health, Education, and Welfare, *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71413 (Dec. 11, 1979) § VII.

[7]    34 C.F.R. § 106.41(c)(1).

(1)     Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2)     Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3)     Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.[8]

As applied by numerous courts,[9] a university must satisfy one[10] of the three "Prongs" of this "Three-Part Test" to show that its "selection of sports . . . effectively accommodate[s] the interests and abilities of members of both sexes."

---

[8]     1979 Policy Interpretation § VII.C.5.a.

[9]     *See, e.g.*, *Cohen v. Brown University*, 991 F.2d 888, 897-900, 903-04 (1st Cir. 1993).

       Although the Third Circuit has not explicitly adopted or approved of this test, it has noted that the 1979 Policy Interpretation as a whole should be given "appreciable deference," *Williams v. School District of Bethlehem, Pa.*, 998 F.2d 168, 171 (3d Cir. 1993), and has noted that a university would be "closer to compliance" with Title IX if the school took a certain action that reduced the Prong One participation gap, *Favia v. Indiana University of Pennsylvania*, 7 F.3d 332, 342 (3d Cir. 1993).

[10]    *See* Office for Civil Rights, United States Department of Education, *Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Tile IX Compliance* (July 11, 2003) ("[E]ach of the three prongs [of the Three-Part Test] is an equally sufficient means of complying with Title IX, and no one prong is favored.").

### 1.    Prong One – Substantial Proportionality

The evidence, even when viewed in the light most favorable to Lock Haven, reveals that the university does not offer "intercollegiate level participation opportunities for male and female students . . . in numbers substantially proportionate to their respective enrollments."

Universities satisfy Prong One when "intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments."[11]   In 1996, the Department of Education's[12] Office for Civil Rights ("OCR") published a clarification ("1996 Clarification") of its 1979 Policy Interpretation.[13]  According to that document, the first step in assessing Prong One satisfaction requires determining the number of "athletic participation opportunities" available at the university.  A comparison is then made between the percentage of these participation opportunities held by students of each sex, on the one hand, and a breakdown of the university's full-time undergraduate student body by sex, on the other hand, to see if these percentages are "substantially proportionate" to one another.

---

[11]   1979 Policy Interpretation § VII.C.5.a.(1).

[12]   Title IX is now administered by the Department of Education.  *Favia*, 7 F.3d at 343.

[13]   Office for Civil Rights, United States Department of Education, *Clarification of Intercollegiate Athletics Policy Guidance:  The Three-Part Test* (Jan. 15, 1996).

An exact correlation between these percentages would clearly show compliance with Three-Part Test. For example, a school whose student body is 50% female would satisfy Prong One if women hold exactly 50% of the school's participation opportunities. According to the 1996 Clarification, however, *substantial* proportionality does not require such *exact* proportionality—which, as a practical matter, would be difficult to achieve.[14] Instead, proportionality determinations are made "on a case-by-case basis" after considering a university's "specific circumstances and the size of its athletic program."[15] For example, if a university demonstrated exact proportionality one year (48% female student body; 48% female athletic participation opportunities) but—due to "natural fluctuations in enrollment and participation rates"—ended up with a small "participation gap" the next (49% female student body; 48% female athletic participation opportunities), the university would still satisfy Prong One.[16] The university would also satisfy Prong One where the number of lost opportunities represented by a participation gap—*i.e.*, the number of athletic participation opportunities that, if given to the

---

[14] *See Cohen v. Brown University*, 101 F.3d 155, 170 (1st Cir. 1996) ("No aspect of the Title IX regime at issue in this case—inclusive of the statute, the relevant regulation, and the pertinent agency documents—mandates gender-based . . . quotas.").

[15] 1996 Clarification.

[16] *Id.*

underrepresented sex, would create exact proportionality—would be insufficient to create a new intercollegiate team.[17]

### 2.    Prong Two – Historical and Continuing Program Expansion

Universities satisfy Prong Two when they have both[18] "a history and [a] continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the members of [the underrepresented] sex."[19] The 1996 Clarification states that this analysis requires a "review [of] the entire history of the [university's] athletic program,"[20] and lists a number of factors that should be considered.  The primary focus, however, is the addition of athletic participation opportunities for the underrepresented sex.[21]  Further, the OCR looks for "actual program expansion" and will not consider Prong Two satisfied when a

---

[17]  *See* 1996 Clarification (noting that, "[a]s a frame of reference in assessing this situation," a court could "consider the average size of teams offered for the underrepresented sex"); *see also Ollier v. Sweetwater Union High School District*, 768 F.3d 843, 857 (9th Cir. 2014) (finding Prong One nonsatisfaction where there were 47 lost opportunities, a number which could "sustain at least one viable competitive team").

[18]  *See Mansourian v. Regents of University of California*, 602 F.3d 957, 969 (9th Cir. 2010) ("'History' and 'continuing practice' . . . constitute two separate inquiries.").

[19]  1979 Policy Interpretation § VII.C.5.a.(2).

[20]  *See Ollier*, 768 F.3d at 857 (noting that satisfying Prong Two requires an "upward trend line" of participation by the underrepresented sex).

[21]  *See Mansourian*, 602 F.3d at 969 (noting that the Prong Two analysis "focuses primarily, but not exclusively, on increasing the number of women's athletic [participation] opportunities rather than increasing the number of women's teams").

university's participation gap is narrowed by the elimination of athletic participation opportunities for the overrepresented sex.[22]

### 3.    Prong Three – Full, Effective Accommodation

Universities satisfy Prong Three when "the [athletic] interests and abilities of the members of [the underrepresented] sex have been fully and effectively accommodated by the [university's] present program."[23]   Facially, this prong requires "a relatively simple assessment of whether there is unmet need in the underrepresented [sex] that rises to a level sufficient to warrant a new team or the upgrading of an existing team."[24]  This is a "high standard"[25] to meet, however, since the existence of any significant[26] unaccommodated interest and ability in the underrepresented sex will prohibit a finding of Prong Three satisfaction, even if there is unmet interest and ability in the overrepresented sex.[27]

---

[22]  *See* 1996 Clarification ("OCR will not find a history and continuing practice of program expansion where an institution increases the proportional participation opportunities for the underrepresented sex by reducing opportunities for the overrepresented sex alone or by reducing participation opportunities for the overrepresented sex to a proportionately greater degree than for the underrepresented sex.").

[23]  1979 Policy Interpretation § VII.C.5.a.(3).

[24]  *Cohen*, 991 F.2d at 900.

[25]  *Id.* at 898.

[26]  *See id.* ("the mere fact that there are some female students interested in a sport does not *ipso facto* require the school to provide a varsity team in order to [satisfy]" Prong Three); *Horner v. Kentucky High School Athletic Ass'n*, 43 F.3d 265, 275 n.9 (6th Cir. 1994) ("an institution is not required to field a team in response to, e.g., the pleas of 'one talented softball player,' if sufficient numbers of individuals to form teams to compete do not exist.").

[27]  *See Cohen*, 991 F.2d at 899 ("The fact that the overrepresented gender is less than fully accommodated will not, in and of itself, excuse a shortfall in the provision of opportunities for

The 1996 Clarification indicates that a Prong Three analysis asks whether, at the subject university, there is unmet interest in a particular sport; sufficient ability to sustain a team in the sport; and a reasonable expectation of competition for the team. That document then goes on to enumerate multiple factors to be considered under each of these three queries. Nonsatisfaction of Prong Three, however, is often shown by pointing to the recent or threatened elimination of a team comprising athletes of the underrepresented sex.[28]

### 4. Burdens of Proof in the Three-Part Test

Neither the regulations, the 1979 Policy Interpretation, nor the 1996 Clarification shed any light on the assignment of the burden of proof in Title IX effective accommodation claims.

Courts seem to agree that plaintiffs bear the burden of proof on Prong One and defendants on Prong Two. Some courts,[29] including federal district courts

---

the underrepresented gender. Rather, [Prong Three requires a university to] fully accommodate[] interested athletes among the underrepresented sex.").

[28] *See Ollier*, 768 F.3d at 858 ("[I]f an institution has recently eliminated a viable team, we presume that there is sufficient interest, ability, and available competition to sustain a team in that sport absent strong evidence that conditions have changed."); *Roberts v. Colorado State Bd. of Agriculture*, 998 F.2d 824, 832 (10th Cir. 1993) ("Questions of fact under th[e] third prong will be less vexing when plaintiffs seek the reinstatement of an established team rather than the creation of a new one.").

[29] *See Kelley v. Board of Trustees*, 35 F.3d 265, 268 (7th Cir. 1994) ("If substantial proportionality [under Prong One] has not been achieved, a school must demonstrate either that it has a continuing practice of increasing the athletic opportunities of the underrepresented sex ([Prong] 2) or that its existing programs effectively accommodate the interests of that sex ([Prong] 3)."); *Ollier*, 768 F.3d at 858 (noting that the school "can still satisfy Title IX if *it* proves" full and effective accommodation) (emphasis added).

within this state,[30] have suggested or stated that the Prong Three burden falls on

defendants.  Other courts, some critical of this approach,[31] have outlined a burden-

shifting framework[32] to use when evaluating effective accommodation claims, under

which plaintiffs bear the burden to show non-proportionality under Prong One,[33]

after which defendants may avoid liability by demonstrating historical and

continuing program expansion under Prong Two.  If that cannot be accomplished,

the burden shifts back to plaintiffs, who can prevail by demonstrating

---

[30]  *See Favia v. Indiana University of Pennsylvania*, 812 F. Supp. 578, 584 (W.D. Pa. 1993) (asserting, without citing any supporting authority, that "[d]efendants bear the burden of proof with respect to the second and third prongs"); *Barrett v. West Chester University of Pennsylvania*, 2003 WL 22803477, at *5 (E.D. Pa. Nov. 12, 2003) ("the burden is on [the university] to prove that [it] [satisfies] either the second or third prong") (citing *Favia*, 812 F. Supp. at 584); *Choike v. Slippery Rock University*, 2006 WL 2060576, at *7 (W.D. Pa. July 21, 2006) (noting, without citing any supporting authority, that "[i]f Plaintiffs [demonstrate that the university has not satisfied Prong One] then the burden shifts to [the university] to demonstrate [satisfaction] under either the second or third prongs").

[31]  *See Cohen*, 991 F.2d at 895 ("[A] court assessing Title IX compliance may not find a violation *solely* because there is a disparity between the gender composition of an educational institution's student constituency, on the one hand, and its athletic programs, on the other hand."); *Cohen*, 101 F.3d at 175 (asserting that putting the Prong Three burden on plaintiffs prevents "imposition of a gender-based quota"); *Roberts*, 998 F.2d at 831 (noting that "a Title IX violation may not be predicated solely on a disparity between the gender composition of an institution's athletic program and the gender composition of its undergraduate enrollment," and that "an institution would be hard-pressed to establish the full and effective accommodation of the interests and abilities of its women athletes in the abstract.").

[32]  *See Horner*, 43 F.3d at 275 ("The plaintiffs bear the burden of proof on subsection (1), that of showing statistical disparity. . . . If the plaintiffs prove disparity, then the institution must show that it satisfies subsection (2).  If it fails here, the plaintiffs may prevail by sustaining their burden of proof under subsection (3) and demonstrating an unmet interest on the part of the underrepresented sex.").

[33]  *But see Cohen*, 991 F.2d at 897-98 ("[A] university which does not wish to engage in extensive compliance analysis may stay on the sunny side of Title IX simply by maintaining gender parity its student body and its athletic lineup.").

unaccommodated interest and ability in the underrepresented sex under Prong Three.[34]

In 2005, the OCR issued another clarification ("2005 Additional Clarification") of its 1996 Policy Interpretation, which clearly stated that the burden of proof on Prong Three is on a plaintiff in a Title IX claim.[35] That clarification was withdrawn by OCR in a 2010 "Dear Colleague" letter[36] which did not mention burdens of proof at all. However, at least one court has continued, after the withdrawal of the 2005 Additional Clarification, to indicate that the Prong Three burden remains with plaintiffs.[37]

---

[34] *See id.* at 903-04 ("The district court incorrectly held that [the university] bore the burden of showing that it had fully and effectively accommodated the interests and abilities of its women athletes. [Title IX] requires that the plaintiffs, rather than the University, prove a shortfall in the full and effective accommodation of interested female athletes by showing, initially, both numerical disparity and unmet interest."); *Roberts*, 998 F.2d at 831 ("[T]he district court improperly placed the [Prong Three] burden of proof on defendant.").

[35] *See* Office for Civil Rights, United States Department of Education, *Additional Clarification of Intercollegiate Athletics Policy: Three-Part Test—Part Three* (Mar. 17, 2005) at 4 ("The burden of proof is on OCR (in the case of an OCR investigation or compliance review), or on students (in the case of a complaint filed with the school under its Title IX grievance procedures), to show by a preponderance of the evidence that the institution is not in compliance with part three.").

[36] Office for Civil Rights, United States Department of Education, *Guidance on Accommodating Students' Athletic Interests and Abilities: Standards for Part Three of the "Three-Part Test"* (Apr. 20, 2010) at 2.

[37] *See Biediger v. Quinnipiac University*, 691 F.3d 85, 98 (2d Cir. 2012) ("Plaintiffs here alleged that Quinnipiac did not treat men and women equally in allocating athletic participation opportunities because the opportunities afforded women (1) were not substantially proportionate to women's undergraduate enrollment, and (2) did not fully and effective accommodate women's athletic interests and abilities. The three-part test did not reduce *plaintiffs' burden* to prove these elements of their disparate treatment claim. Rather, it afforded Quinnipiac three distinct opportunities to demonstrate that its sex-based treatment of athletes was not unlawful.") (emphasis added).

- 11 -

## B.    Effective Accommodation—The Levels-of-Competition Test

The regulations also ask whether universities' "levels of competition effectively accommodate the interests and abilities of members of both sexes."[38] The 1979 Policy Interpretation indicates that compliance in this area is measured, *inter alia*, by querying:

(1)    Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; or

(2)    Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.[39]

This has been called the "Two-Part"[40] or the "Levels-of-Competition Test" and a university fails to effectively accommodate its students' athletic interests and abilities if it fails this test *or* the Three-Part Test.[41]

---

[38]    34 C.F.R. § 106.41(c)(1).

[39]    1979 Policy Interpretation § VII.C.5.b.

[40]    *See McCormick ex rel. McCormick v. School Dist. of Mamoroneck*, 370 F.3d 275, 301 (2d Cir. 2004) ("[T]he three-part test relates to participation opportunities, and a second, two-part test relates to the competitive schedules and opportunities for men's and women's teams.").

[41]    *Biediger v. Quinnipiac University*, 928 F. Supp. 2d 414, 437 (D. Conn. 2013).

## C.    Equal Treatment

Finally, the regulations ask if universities treat their male and female student athletes equally when distributing various athletic benefits.[42]  The 1979 Policy Interpretation indicates that compliance in this area is measured by examining:

(1)    Whether the policies of an institution are discriminatory in language or effect; or

(2)    Whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole; or

(3)    Whether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity.[43]

Plaintiffs do not argue that Lock Haven's policies are facially discriminatory. Therefore, to succeed on their equal treatment claim, Plaintiffs must show that there is a substantial disparity between the treatment of male and female athletes in an individual segment of Lock Haven's athletics program or in the athletics program as a whole.[44]

---

[42]    34 C.F.R. § 106.41(c)(2)-(10).

[43]    1979 Policy Interpretation § VII.B.5; *see also McCormick*, 370 F.3d at 293 ("[U]nder the Policy Interpretation, a disparity in one program component (i.e., scheduling of games and practice time) can alone constitute a Title IX violation if it is substantial enough in and of itself to deny equality of athletic opportunity to students of one sex at a school[,] [but] the Policy Interpretation [also] contemplates that a disparity disadvantaging one sex in one part of a school's athletics program can be offset by a comparable advantage to that sex in another area.").

[44]    *Parker v. Franklin County Community School Corp.*, 667 F.3d 910, 919 (7th Cir. 2012).

## II.    PLAINTIFFS' TITLE IX CLAIMS

As indicated at the outset, this lawsuit was ignited by threats to the women's field hockey and swim teams at Lock Haven.  The operative complaint contains a claim under the Three-Part Test (Count I); a claim under the Levels-of-Competition Test (Count II); and a claim under the Equal Treatment Test (Count III).  Plaintiffs' motion for summary judgment, however, sharpens those issues and argues:

(1)    that Lock Haven fails to effectively accommodate its female students' athletic interests and abilities, as measured by the Three-Part test;

(2)    that Lock Haven's threatened demotion of its women's field hockey team from Division I to Division II violates Title IX; and

(3)    that Lock Haven treats its female student-athletes inequitably in terms of:

   (A)    equipment, uniforms, and supplies,

   (B)    practice times, opportunities to compete, and scheduling of games and practices,

   (C)    access to coaching,

   (D)    locker rooms, practice, and competitive facilities,

   (E)    conditioning, weight room, and rehabilitation, and

   (F)    publicity and advertising.

Lock Haven's cross-motion for summary judgment argues that the university effectively accommodates its female students' athletic interests and abilities, as measured by the Three-Part Test; and that the university treats its male and female student-athletes equitably in all the other areas measured by Title IX's implementing regulations.

## A. Whether Lock Haven Effectively Accommodates Its Female Students' Athletic Interests and Abilities Under the Three-Part Test

Plaintiffs argue that Lock Haven, as a matter of law, does not effectively accommodate its female students' athletic interests and abilities, as measured by the Three-Part Test. Lock Haven argues the opposite.

### 1. Whether Lock Haven Satisfies Prong One

Pursuant to the Equity in Athletics Disclosure Act ("EADA"),[45] Lock Haven is required to submit a report to the Department of Education detailing the number of male and female undergraduate students that attend the university, as well as listing of university's varsity teams and the total number of participants on each team. The following table summarizes Lock Haven's EADA data from the 1995-1996 academic year through the 2017-2018 academic year,[46] and shows—based on that data—the participation gap at Lock Haven as well as the number of lost opportunities that participation gap represents.

---

[45]  20 U.S.C. § 1092(g).

[46]  JCMP at 5; Plaintiffs' Ex. 2 (ECF No. 121-2); Plaintiffs' Ex. 9 (ECF No. 121-3).

| Academic Year | Percentage of Student Body that is Women | Number of Athletic Participation Opportunities Held by Women | Percentage of Athletic Participation Opportunities Held by Women | Participation Gap | Lost Opportunities |
|---|---|---|---|---|---|
| 1995-1996 | 54.39% | 168 | 39.16% | 15.23% | 143 |
| 1996-1997 | 54.56% | 174 | 40.00% | 14.56% | 139 |
| 1997-1998 | 53.28% | 197 | 42.18% | 11.09% | 111 |
| 1998-1999 | 54.01% | 195 | 38.77% | 15.24% | 167 |
| 1999-2000 | 55.11% | 226 | 41.85% | 13.26% | 159 |
| 2000-2001 | 56.57% | 234 | 44.49% | 12.09% | 146 |
| 2001-2002 | 57.18% | 213 | 39.96% | 17.22% | 214 |
| 2002-2003 | 59.97% | 221 | 42.58% | 17.39% | 225 |
| 2003-2004 | 58.05% | 204 | 41.98% | 16.07% | 190 |
| 2004-2005 | 58.04% | 253 | 44.94% | 13.10% | 176 |
| 2005-2006 | 57.24% | 233 | 42.67% | 14.57% | 186 |
| 2006-2007 | 58.96% | 216 | 43.72% | 15.24% | 183 |
| 2007-2008 | 57.01% | 264 | 49.44% | 7.57% | 94 |
| 2008-2009 | 55.94% | 261 | 48.15% | 7.79% | 96 |
| 2009-2010 | 56.23% | 251 | 46.92% | 9.31% | 114 |
| 2010-2011 | 54.91% | 266 | 48.63% | 6.28% | 76 |
| 2011-2012 | 55.92% | 268 | 49.45% | 6.48% | 80 |
| 2012-2013 | 55.89% | 236 | 46.27% | 9.61% | 111 |
| 2013-2014 | 55.89% | 235 | 47.00% | 8.89% | 101 |
| 2014-2015 | 55.49% | 272 | 50.56% | 4.93% | 60 |
| 2015-2016 | 56.07% | 259 | 48.50% | 7.56% | 92 |
| 2016-2017 | 56.08% | 280 | 51.09% | 4.98% | 62 |
| 2017-2018 | 55.54% | 251 | 52.18% | 3.35% | 36 |

Although EADA reports are regularly relied upon in Title IX cases, these numbers may not be unassailable evidence of satisfaction vel non of Prong One.[47] The EADA instructs universities to report the number of people on the school's

___

[47] *See Biediger v. Quinnipiac University*, 616 F. Supp. 2d 277, 297 (D. Conn. 2009) ("Although an EADA report can be used to make a prima facie showing of substantial proportion[ality], plaintiffs are permitted to look behind those numbers . . . to determine whether those EADA numbers actually represent genuine, not illusory, athletic participation opportunities.").

varsity teams "as of the day of the first scheduled contest for the team."[48] The 1996 Clarification, however, provides a different method of counting a school's participation opportunities, which indicates that a more nuanced method is appropriate.[49] Relying on that clarification, Plaintiffs and their expert have conducted a thorough analysis of practice and competition attendance records for the 2016-2017 and 2017-2018 academic years, and use this analysis to argue that the participation gap was 8.95% (representing 103 lost opportunities) for the 2016-2017 academic year and 7.05% (representing 79 lost opportunities) for the 2017-2018 academic year.[50]

---

[48] 20 U.S.C. § 1092(g)(1)(B)(i).

[49] The 1996 Clarification indicates that a student athlete should be counted for Prong One purposes if he or she:

    a. [R]eceive[s] the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

    b. [P]articipat[es] in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

    c. [Is] listed on the eligibility or squad lists maintained for each sport; or

    d. [B]ecause of injury, cannot meet a, b, or c above but continue[s] to receive financial aid on the basis of athletic ability.

That document, however, goes on to state that, "[a]s a general rule, all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants," which guidance seems to align with the EADA's counting procedures. At least one court has questioned the 1996 Clarification on this issue. *See Biediger*, 928 F. Supp. 2d at 441 n.35 ("I urge the OCR to clarify the definition of 'participant' . . . .").

[50] Plaintiffs' Ex. 1 (Expert Report of Donna Lopiano, Ph.D.; ECF No. 121-2) at 64 (purporting to show that, during the 2016-2017 academic year, women held 238 of 505—or 47.13%—of the athletic participation opportunities at Lock Haven); Plaintiffs' Ex. 22 (ECF No. 121-5) (purporting to show that, during the 2017-2018 academic year, women held 241 of 497—or 48.49%—of the athletic participation opportunities at Lock Haven).

These disputed figures do not prevent this Court from ruling that, as a matter of law, Lock Haven has not effectively accommodated its female students' athletic interests and abilities. The EADA numbers themselves show a participation gap of 3.35% in the 2017-2018 academic year. While this could be termed a "borderline case"[51] in terms of raw statistics, a glance at Lock Haven's long history of Prong One nonsatisfaction reveals that that gap cannot be attributed to natural fluctuations in the student body, and the number of lost opportunities that that gap represents— 36—is not too small to support a new varsity team.[52]

In fact, Lock Haven does not even attempt to argue that the 3.35% participation gap satisfies Prong One. Instead, it focuses on numbers for the current (2018-2019) academic year, which it asserts show a participation gap of only

---

This Court specifically notes the assertion that the 2017-2018 EADA numbers do not reflect the fact that 36 men participated in indoor track practices and competitions, despite the elimination of the men's indoor track team in 2017; and the suggestion that this was orchestrated to deliberately manipulate the athletic participation opportunity numbers for purposes of Title IX compliance purposes. *See Biediger v. Quinnipiac University*, 728 F. Supp. 2d 62, 107 (D. Conn. 2010) (counting cross country team members as track team members because of their "substantial contribution" to the track team).

[51] *Biediger*, 728 F. Supp. 2d at 111 (D. Conn. 2010); *see also Portz v. St. Cloud State University*, 196 F. Supp. 3d 963, 975 (D. Minn. 2016) (collecting cases on substantial proportionality).

[52] Plaintiffs' Ex. 9 (ECF No. 121-3) (showing that all women's teams have fewer than 36 members, except for women's indoor track—which has 43—and women's outdoor track— which has 40); *see Biediger*, 691 F.3d at 105-08 (upholding a finding of Prong One nonsatisfaction where the participation gap was 3.62%, representing 38 lost opportunities, since the gap was "almost entirely attributable to [the university's] own careful control of its athletic rosters"—not fluctuations in the student body—and since the roster of every women's varsity team at the university was smaller than that gap).

2.25%.[53]  While such a gap may satisfy Prong One,[54] and while those numbers may eventually help Lock Haven show satisfaction at trial, Lock Haven itself concedes that some of the proffered numbers are merely "anticipated" and not actual.[55]  They may not, therefore, be relied upon at the summary judgment stage.[56]

Lock Haven does not currently satisfy Prong One.

## 2.    Whether Lock Haven Satisfies Prong Two

The undisputed evidence shows that, as a matter of law, Lock Haven does not have a "history . . . of program expansion which is demonstrably responsive to the developing interest and abilities of" its female students.[57]

---

[53]  For 2018-2019, Lock Haven asserts that 1,463 of its 2,634 full-time undergraduate students (or 55.54%) are women, and that 251 of its 471 athletic participation opportunities (or 53.29%) are held by women.

[54]  *See Boulahanis v. Board of Regents*, 198 F.3d 633, 639 (7th Cir. 1999) (indicating that the university "has achieved substantial proportionality" when it brought the participation gap "within three percentage points of enrollment").

[55]  Attachment G-59 to Defendant's Ex. 22 (ECF No. 125-39).

[56]  *See Biediger*, 728 F. Supp. 2d at 113 (noting that "determination [about participation numbers] can only be made with a factual record documenting *what actually occur[s]* during th[e] teams' seasons") (emphasis added).

This is not to say, however, that Lock Haven cannot rely on these numbers when they are become "actual," not "anticipated.  Lock Haven also points to its proposal to add a women's tennis team in 2019 and a women's golf team in 2020.  Plaintiffs' Ex. 23 (ECF No. 121-5). Like the "anticipated" participation numbers, these remain speculative and are ineligible for current consideration.  *See Boucher v. Syracuse University*, 164 F.3d 113, 119 (2d Cir. 1999) ("Because full implementation of a varsity women's softball team would render the remaining live aspect of this case moot, we again choose not to reach the merits of the University's safe harbor defense, and prefer instead to remand the case to the district court with instructions to dismiss the case if the University completes its plan to institute a varsity women's softball team by the date indicated.").

[57]  Lock Haven again points to its plans to add women's tennis and golf, as well as its efforts to elevate women's rugby from club to varsity status, as evidence of its continuing practice of

In terms of raw numbers, while the number of athletic participation opportunities held by female students rose fairly consistently between the 1995-1996 and the 2000-2001 academic years, that number rose and fell repeatedly over the next seventeen academic years.[58]  In terms of the number and types of women's teams available at Lock Haven, the data from the past few decades reveals the same rollercoaster pattern, resulting in a net of zero women's teams added in the past twenty years,[59] even as women's club teams repeatedly requested elevation to varsity status[60] and school administrators recommended adding teams.[61]  And in terms of the university's participation gap, while that percentage was cut in half in 2007, it oscillated around 15.25% for the twelve academic years before that drop, and around 7.5% for the nine academic years following it.

Lock Haven does not satisfy Prong Two.

---

program expansion.  But because Lock Haven needs to show both a history *and* a continuing practice of program expansion, and because Lock Haven cannot show a history of program expansion, this Court need not—and therefore does not—decide if this evidence shows a continuing practice of program expansion.

[58]  *See Ollier*, 768 F.3d at 857-58 (noting that "'dramatic ups and downs' are far from the kind of 'steady march forward' that an institution must show to demonstrate Title IX compliance under" Prong Two).

[59]  Lock Haven eliminated women's gymnastics in 1990, added women's volleyball in 1991, eliminated women's tennis in 1993, and added women's soccer in 1994.  JCMP at 6.

[60]  The women's club rugby team requested elevation to varsity status in 2008 and 2011, and the women's club wrestling team requested elevation in 2012.  JCMP at 6.

[61]  Plaintiffs' Statement of Facts (ECF No. 121) ¶ 59 and accompanying exhibits.

### 3.    Whether Lock Haven Satisfies Prong Three

At the outset of this lawsuit, Lock Haven was pondering the elimination of its women's swim team. Had it effectuated that plan, it would have been relatively easy for this Court to hold that Lock Haven was not fully and effectively accommodating its female students' athletic interests and abilities.[62] The Lock Haven women's swim team, however, apparently remains active.[63] But with that threat out of the picture, the Prong Three analysis becomes more difficult.

Neither party addressed the Prong Three burden of proof in its brief. Because disputed issues of material fact prevent the entry of summary judgment for either party no matter where the burden falls, this Court will not now decide where that burden lies. Plaintiffs, arguing that Lock Haven does not satisfy Prong Three, point to the repeated requests by the women's club rugby team to be elevated to varsity status.[64] Lock Haven has produced evidence, however, showing a lack of available

---

[62]   *See Cohen*, 991 F.2d at 904 ("Although the full and effective accommodation of athletic interests is likely to be a complicated issue where allegedly underrepresented plaintiffs sue to force a university to create a neoteric team or upgrade the status of a club team, there is unlikely to be any comparably turbid question as to interest and ability where . . . plaintiffs are seeking merely to forestall the interment of healthy varsity teams.").

[63]   It can be argued, however, that the threat to the women's swim team, which included the termination of the team's full-time coach, damaged Lock Haven's chances of passing the Three-Part Test by causing a radical deflation of that team's roster. In 2016-2017, the women's swim team had 22 athletes. Plaintiffs' Statement of Facts ¶ 69. The 2017-2018 women's swim team had only 9 members; the 2018-2019 team had 11. *Id.* ¶¶ 78-79.

[64]   Plaintiffs also argue that Lock Haven's elimination of women's gymnastics in 1990 and women's tennis in 1993 demonstrates Prong Three nonsatisfaction. The fact that female students had the interest and ability to play those sports more than twenty-five years ago does not, in this Court's view, show that such interest and ability currently exists on campus.

competition for the proposed Division II team, as well as insufficient interest in that sport by female students.[65]  Lock Haven, asserting Prong Three satisfaction, argues that surveys taken of the student body reveal insufficient interest to support any new women's teams.[66]  Plaintiffs, however, point to the low response rate[67] of these surveys to question the surveys' reliability.

At this stage, then, this Court cannot hold, as a matter of law, that Lock Haven does, or does not, satisfy Prong Three.  Because Lock Haven could show Prong Three satisfaction—and therefore Title IX compliance—at trial, both parties' request for summary judgment on Count I of Plaintiffs' Amended Complaint must be denied.

---

[65]  *See* Defendant's Ex. 9 (Deposition of Michael Fioretino; ECF No. 118-9) at 60 (noting that women's rugby was not elevated in 2013 because "the ability for Division II [varsity] competition was not regional"); Defendant's Ex. 13 (Deposition of Rodney Jenkins; ECF No. 118-13) at 75 (noting that women's rugby team is "struggling to keep enough players on the team"); Defendant's Ex. 15 (Deposition of Alice Maroney; ECF No. 118-15) at 14 ("Currently there is no rugby team.").

[66]  *See* Defendant's Ex. 22 (Declaration of Donna Wilson; ECF No. 124-1) ¶ 128 ("Since at least 2015, an annual analysis has been performed by surveying student interest in varsity athletic programs to support the institution's compliance with Title IX with respect to the athletic programs sponsored."); ¶ 129 ("The results of the surveys have not revealed sufficient interest in any sports having enough competitive opportunities available for any proposed teams.").

[67]  *See* Plaintiffs' Statement of Facts ¶¶ 89, 96 and accompanying exhibits (showing response rates as low as 17%); *Barrett*, 2003 WL 22803477, at *9 (E.D. Pa. Nov. 12, 2003) (noting that a "39% [survey] response rate . . . was not sufficient to provide . . . a reliable basis upon which to conclude that [the university] was in compliance with [Prong Three]").

## B.    Whether Lock Haven Violates Title IX By "Threatening" to Demote Women's Field Hockey to Division II

Plaintiffs argue that Lock Haven is "threatening" to demote its women's field hockey team to Division II status, and that this threat violates Title IX.

As noted earlier, this lawsuit was filed shortly after Lock Haven revealed, in January 2017, that it was considering demoting its women's field hockey team from Division I to Division II status.  Rather than make that demotion immediately, Lock Haven eventually decided to conduct a year-long review of the field hockey team's status during the 2017-2018 academic year,[68] which review would include an analysis of the team's fundraising capabilities and progress in that area.[69]  Plaintiffs argue that this plan required field hockey to match the fundraising achievement of the men's wrestling team (the school's only other Division I team) in order to maintain its Division I status.[70]

Plaintiffs do not pinpoint which Title IX theory of liability they are relying on when they argue that Lock Haven's treatment of women's field hockey violates Title

---

[68]   *See* March 6, 2017 Lock Haven University Athletics' Department Realignment Plan (ECF No. 63-5) at 4 ("A one-year expanded review of the proposal to move our Women's Field Hockey program from NCAA Division I to NCAA Division II.").

[69]   *See* Defendant's Ex. 9 at 75 (Q: "But you think [fundraising] can be a factor in . . . making the decision to stay a Division I versus Division II?"  A: "I think it can.").

There is evidence that the 2017-2018 review process was expanded to include all athletics at Lock Haven.  *See*  Defendant's Ex. 11 (February 27, 2018 Deposition of Thomas Gioglio; ECF No. 118-11) at 46 ("We're doing a program evaluation of all the sports and field hockey is included in that.").

[70]   *See* Defendant's Ex. 13 at 94 (Q:  "Is there an amount of money it has to raise?"  A: "There was no amount put on it.  It needs to be reasonable as it relates to the other D-I program.  We

IX, but this Court can ascertain at least two possibilities. First, Plaintiffs could be

arguing that Lock Haven's demotion of field hockey would cause the university to

fail the first part of the Levels-of-Competition test (the part that asks "whether the

competitive schedules for men's and women's teams, on a program-wide basis,

afford proportionally similar numbers of male and female athletes equivalently

advanced competitive opportunities"), since at least some Lock Haven men would

be able to participate on a Division I team, while no Lock Haven women would have

that opportunity.[71] Second, Plaintiffs could be arguing that the demotion would

violate Prong Three of the Three-Part Test (the prong that asks if "the interests and

abilities of the members that sex have been fully and effectively accommodated by

the present program"), since the university would be actively *denying*

accommodation to existing, proven interest and ability.

      Regardless of the legal theory relied upon, this Court does not have the

authority to enjoin Lock Haven from merely *thinking about* actions that would

---

never talked about a dollar-for-dollar match."); Defendant's Ex. 10 (July 19, 2017 Deposition of Thomas Gioglio; ECF No. 118-10) at 65 (agreeing that there is an "expectation" that the field hockey team would raise the same amount of money as the wrestling team).

[71] *See Biediger*, 928 F. Supp. 2d at 467-71 (D. Conn. 2013) (finding that a university violated the Levels-of-Competition Test where all of its men's teams played against Division I teams, but only some of its women's teams did so); *Portz v. St. Cloud State University*, 2018 WL 6075673, at *2 (D. Minn. Nov. 21, 2018) ("The levels-of competition test appears to be especially relevant where, as here, an institution's athletic teams compete at different levels— NCAA Division I and Division II.").

violate Title IX.[72]  And in any event, Lock Haven asserts—and points to evidence showing[73]—that the demotion plan is no longer on the table.  Summary judgment on this ground, therefore, is improper.

### C.    Whether Lock Haven's Provision of Athletic Benefits Violates Title IX

Plaintiffs argue that Lock Haven's provision of a host of athletic benefits is inequitable and, thus, in violation of Title IX.

Plaintiffs' expert, Dr. Donna Lopiano, has written a thorough, carefully analyzed report after conducting an on-site inspection of Lock Haven's athletics program.  The report meticulously divides its analysis between the treatment given to the school's Division I teams and the treatment given its Division II teams,[74] and explains the methodology behind the qualitative assessment of numerous benefits.[75] Ultimately, the report finds inequities in the provision of, *inter alia*, equipment and apparel, practice times and facilities, locker rooms, competition facilities, and weight

---

[72]    Challenging actions that Lock Haven is merely contemplating also raises questions of ripeness. *See Peachlum v. City of York, Pennsylvania*, 333 F.3d 429, 433 (3d Cir. 2003) ("The function of the ripeness doctrine is to determine whether a party has brought an action prematurely, and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.").

[73]    *See* Defendant's Ex. 9 at 74-75 (noting that fundraising is "part of the coaches' job" but that "[n]ot meeting a particular goal in fundraising wouldn't, for me, tie that directly to a decision regarding Division II"); Defendant's Ex. 22 ¶ 138 ("The field hockey team at [Lock Haven] remains at the Division I level."); *id.* ¶ 140 ("[Fi]eld hockey will not be dropped to NCAA Division II.").

[74]    Defendant's Ex. 1 at 75-109.

[75]    Exs. F through V to Defendant's Ex. 1.

room access. Lock Haven does not have an expert, but asserts that the report does not reflect the current situation at Lock Haven and disputes some of Dr. Lopiano's methodology.

Plaintiffs' brief supporting their motion for summary judgment mentions many of the areas identified by Dr. Lopiano as inequitable, but does not clarify whether Plaintiffs are arguing that there is a substantial disparity in any individual segment of Lock Haven's athletics program, or whether they are arguing that a substantial disparity exists when the athletics program is viewed as a whole. Nevertheless, in a fact-sensitive and fact-specific area such as this, Plaintiffs' showing is sufficient to defeat Lock Haven's motion for summary judgment on this claim, but insufficient to allow this Court to conclude that Lock Haven, as a matter of law, inequitably distributes its athletics benefits in such a way as to violate Title IX.[76]

## III. CLASS CERTIFICATION

Plaintiffs have moved, pursuant to Federal Rule of Civil Procedure 23(b)(2), to certify a class of

> all present, prospective, and future Lock Haven University female students who participate, seek to participate, or have been deterred or

---

[76] Because this Court is denying summary judgment on the equal treatment claim, it need not address Lock Haven's suggestion that requiring teams to fundraise for certain equipment and supplies does not violate Title IX. *But see Chalenor v. University of North Dakota*, 291 F.3d 1042, 1048 (8th Cir. 2002) ("Once a university receives a monetary donation, the funds become public money, subject to Title IX's legal obligations in their disbursement.").

prevented from participating in or obtaining the benefits of intercollegiate athletics at Lock Haven University.[77]

Lock Haven has identified a number or problems with this proposed class. First, the interests of the named Plaintiffs conflict with the interests of other members of the proposed class,[78] due to the nature of the claims at issue.[79] Effective accommodation and equal treatment claims seek to have universities distribute more benefits (in the form of athletic participation opportunities, equipment and supplies, etc.). Title IX, to some extent, does not care *who* receives the bonus benefits, as long as they go to the underrepresented sex. A university shown to be ineffectively accommodating the athletic interests and abilities of its female students, for example, could obtain satisfaction with that Title IX requirement by creating a new women's team or by expanding the size of a current women's team. The specific team chosen for creation or expansion can be irrelevant for effective accommodation purposes. Nevertheless, the named plaintiff here who is a member of the women's club rugby

---

[77]  ECF No. 60.  Plaintiffs also seek appointment of class counsel under Rule 23(g).

[78]  This conflict would violate Rule 23(a)(3)'s requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," *see In re Schering Plough Corp. ERISA Litigation*, 589 F.3d 585, 599 (3d Cir. 2009) (noting that typicality requires considering whether "the interests and incentives of the representative [are] sufficiently aligned with those of the class"), as well as Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class," *see Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997) (noting that adequacy of representation requires the "class representative [to] possess the same interest . . . as the class members").

[79]  *See Gordon v. Jordan School District*, 2018 WL 4899098, at *2 (D. Utah Oct. 9, 2018) (finding a failure of the adequacy requirement because members of the proposed class sought "conflicting remedies").

team would understandably desire the creation of a new women's varsity rugby team—and would likely advocate in favor of injunctive relief requiring that specific remedy. A similar analysis applies to equal treatment claims, since Title IX often does not care how a university chooses to remedy unequal overall treatment (assuming that no one component is distributed excessively unequally), and since the named plaintiffs would likely advocate in favor of injunctive relief giving their own teams the extra equipment.

Second, Lock Haven notes that the named plaintiffs' claims involve circumstances that are different than some of the individuals in the proposed class.[80] For example, the proposed class definition could be read to include women who, while perhaps interested in playing a sport at the university someday, might not be able to, or might decide not to, attend the school for reasons unrelated to Lock Haven's athletics program (such as an offer from another school or an inability to meet the school's academic requirements). Not only would these proposed class members be a nebulous bunch,[81] they might not have a Title IX claim against Lock

---

[80] *See Weiss v. York Hospital*, 745 F.2d 786, 809 n.36 (3d Cir. 1984) ("[W]here the named plaintiff's individual circumstances are markedly different or where the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based, there exists the danger that the unique circumstances or legal theory will receive inordinate emphasis and that the other claims will not be pressed with equal vigor or will go unrepresented.").

[81] While the Third Circuit has made it clear that "ascertainability" is not required for certification under Rule 23(b)(2) when—as here—plaintiffs seek only declaratory and injunctive relief, there must still be a "readily discernible, clear, and precise statement of the parameters defining the class." *Shelton v. Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015).

Haven at all.  The proposed class definition might also include Lock Haven women who have an interest, but not the ability, to play a sport at the varsity level.  These women might wish to obtain Title IX relief from Lock Haven, but such relief would look quite different than the relief proposed by the named plaintiffs here, which involves maintaining existing varsity teams or elevating a club team to varsity status.

The Court, therefore, cannot certify the proposed class, and will deny the pending motion seeking that certification.[82]  That denial, however, will be without prejudice, and plaintiffs may move to[83] certify any or all the following three subclasses:

- All present and future members of the women's varsity field hockey team at Lock Haven;

- All present and future members of the women's varsity swim team at Lock Haven; and

- All present and future members of the women's club rugby team at Lock Haven.

If Plaintiffs move to certify any or all of those subclasses, their accompanying brief should address whether the proposed subclasses meet the requirements of Rule 23,

---

[82] At least one court, faced with a similar proposed class, redefined the class as all students "who are harmed by and want to end" sex discrimination at the subject university.  *Portz v. St. Cloud State University*, 297 F. Supp. 3d 929, 935 (D. Minn. 2018).  In this Court's view, however, such a redefined class does not resolve the conflicting interests problem.

[83] *See Shelton*, 775 F.3d at 564 ("Courts have discretionary authority to reshape the boundaries and composition of the class . . . [in order to] better serve the purposes of Rule 23 and the underlying policies of the substantive law than would denying certification altogether.").

and should *also* address whether the creation of the proposed subclasses would require the appointment of separate counsel for each subclass.

## III.    CONCLUSION

For the reasons discussed above, the parties cross-motions for summary judgment will be denied, and Plaintiffs' motion for class certification will be denied. An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge